PLANNED PARENTHOOD OF WISCON-
SIN, Gary T. Prohska, M.D., Fredrik F.
Broekhuizen, M.D., Gavin Jacobson,
M.D., Neville Sender, M.D., Dennis D.
Christensen, M.D. and Bernard Smith,
M.D., on behalf of themselves and their
patients seeking abortions, Plaintiffs,

v.

James E. DOYLE, in his official capacity
as the Attorney General of the State of
Wisconsin and Diane M. Nicks, in her
official capacity as District Attorney for
Dane County and as representative of a
class of all District Attorneys in Wiscon-
sin, Defendants.

No. 98–C–305–S.

United States District Court,
W.D. Wisconsin.

June 15, 1998.

Kelly Hardy, Quarles & Brady, Milwaukee WI, for Planned Parenthood of Wisconsin, Gary T. Prohaska, M.D., Fredrik F. Broekhuizen, M.D., Gavin Jacobson, M.D., Neville Sender, M.D., Dennis D. Christensen, M.D., Bernard Smith, M.D., Plaintiffs.

Susan K. Ullman, Assistant Attorney General, Madison, WI, for James E. Doyle, Diane M. Nicks, Defendants.

Scott D. Obernberger, Milwaukee, WI, for Thomas J. Back, Fredric K. Buford, II, Defendants.

## MEMORANDUM and ORDER

SHABAZ, District Judge.

Plaintiffs Planned Parenthood of Wisconsin and six Wisconsin physicians commenced this action under 42 U.S.C. § 1983 on behalf of themselves and their abortion-seeking patients to challenge the constitutionality of 1997 Wisconsin Act 219, passed as Assembly Bill 220 (AB 220) and codified at §§ 895.038 and 940.16, Wis. Stats. ("the Act"). The Act subjects those who intentionally perform a partial-birth abortion to civil and criminal liability. Plaintiffs have sued Wisconsin Attorney General James E. Doyle and Dane County District Attorney Diane Nicks in their official capacities. They have also named Nicks as representative of the class of state officials responsible for the enforcement of Wisconsin's criminal laws to which class certification the defendants do not object.

The Court has jurisdiction over the subject matter of this civil rights action pursuant to 28 U.S.C. § 1443.

Plaintiffs previously brought a motion for a temporary restraining order which the Court denied. The matter is now before the Court on plaintiffs' motion for a preliminary injunction. The Court permitted defendants Thomas Back and Fredric Buford to intervene in this matter pursuant to Rule 24(b)(2), Federal Rules of Civil Procedure, for purposes of this motion only. Plaintiffs filed their final reply on June 10, 1998.

## RELEVANT STATUTORY PROVISIONS

The challenged statutes provide in relevant part:

940.16 *Partial-birth abortion.*

(1) In this section:

(a) "Child" means a human being from the time of fertilization until it is completely delivered from a pregnant woman.

(b) "Partial-birth abortion" means an abortion in which a person partially vaginally delivers a living child, causes the death of the partially delivered child with the intent to kill the child, and then completes the delivery of the child.

(2) Except as provided in sub. (3), whoever intentionally performs a partial-birth abortion is guilty of a Class A felony.

(3) Subsection (2) does not apply if the partial-birth abortion is necessary to save the life of a woman whose life is endangered by a physical disorder, physical illness or physical injury, including a life-endangering physical disorder, physical illness or physical injury caused by or arising from the pregnancy itself, and if no other medical procedure would suffice for that purpose.

895.038 *Partial-birth abortions; liability.*

(1) In this section:

(a) "Child" has the meaning given in s. 940.16(1)(a).

(b) "Partial-birth abortion" has the meaning given in s. 940.16(1)(b).

(2) (a) Except as provided in par. (b), any of the following persons has a claim for appropriate relief against a person who performs a partial-birth abortion:

1. If the person on whom a partial-birth abortion was performed was a minor, the parent of the minor.

2. The father of the child aborted by the partial-birth abortion.

(b) A person specified in par. (a)1 or 2 does not have a claim under par.(a) if any of the following apply:

1. The person consented to performance of the partial-birth abortion.

2. The pregnancy of the woman on whom the partial-birth abortion was performed was the result of a sexual assault ... that was committed by the person.

(3) The relief available under sub. (2) shall include all of the following:

(a) If the abortion was performed in violation of s. 940.16, damages arising out of the performance of the partial-birth abortion, including damages for personal injury and emotional and psychological distress.

(b) Exemplary damages equal to 3 times the cost of the partial-birth abortion.

## FACTS

For purposes of this motion, the following relevant facts are undisputed.

*Abortion procedures generally.* Physicians perform abortions by at least six procedures including suction curettage, dilation and extraction, intact dilation and extraction, induction, hysterotomy and hysterectomy. Determining which method of abortion to use for a particular patient depends on a range of factors, including the gestational age of the fetus, the woman's health, any medical contraindications, the physician's skill, the woman's preferences, the woman's prior surgical history, whether the woman wants to preserve her future fertility and whether it would be beneficial to remove the fetus intact to permit more complete genetic testing.

The procedure most commonly used in the first trimester of pregnancy is suction curettage (also known as suction aspiration or vacuum aspiration). In a suction curettage procedure, generally, the physician dilates the cervix, inserts a tube through the cervix into the uterus and removes the embryo or fetus and other products of conception with suction. Then the physician will scrape the inside of the uterus with a sharp curette to ensure that nothing remains. The procedure takes a few minutes. Frequently the physician must make multiple passes through the uterus with suction before it is empty. Sometimes during a suction curettage procedure part of the fetus is removed while another part remains in utero that still has a heartbeat.

The most common method of second-trimester abortion is the dilation and evacuation (D & E) procedure. In a conventional D & E procedure the physician generally will dilate the cervix using laminaria (osmotic dilators placed in the woman's cervix which absorb natural moisture and expand, dilating the cervix). The laminaria remain overnight. After the laminaria are removed the physician will use a vacuum curette to rupture the membranes (amniotic sac), and then vacuum to remove as much of the fetus and other products of conception as possible. The physician will use forceps to remove the remainder. The calvarium (skull) of the fetus is often too large to wholly pass through the cervix, and in those circumstances must be compressed prior to completion of the procedure. Frequently the D & E procedure results in disjoining of the fetus. As a result the physician may bring a disjoined part of the fetus into the vagina while other parts remain in utero and while the fetus continues to have a heartbeat.

A variant of the conventional D & E procedure is the "intact D & E" procedure (also known as "dilation and extraction," "D & X" or "intact D & X"). Plaintiff Christiansen describes this procedure in his affidavit as follows:

> In the intact D & E procedure ... the physician dilates the cervix and then removes the fetus from the uterus through the vaginal canal intact. The physician extracts the fetal body intact, usually feet first, until the cervix is obstructed by the aftercoming head, which is too large to pass through the cervix. Then the physician creates a small opening at the base of the skull and evacuates the contents, allowing the calvarium to pass through the cervical opening. The intentional removal of the fetus intact is what distinguishes an intact D & E procedure from a D & E procedure.

Christensen performs one or two intact D & E procedures per year ("less than a dozen" over the course of his career as of May 1997). He does not specify whether he performs these procedures in his Wisconsin or Michigan office.

The American College of Obstetricians and Gynecologists (ACOG) has also described the intact D & E procedure (using the procedure's alternative name "intact D & X"). In a policy statement issued January 12, 1997 ACOG states its belief that "the intent of such legislative proposals [to ban partial-birth abortion] is to prohibit a procedure referred to as 'Intact Dilation and Extraction' (Intact D & X)." ACOG describes Intact D & X as a procedure involving each of the following steps:

1. Deliberate dilation of the cervix, usually over a sequence of days;

2. Instrumental conversion of the fetus to a footling breech;

3. Breech extraction of the body excepting the head; and

4. Partial evacuation of the intracranial contents of a living fetus to effect vaginal delivery of a dead but otherwise intact fetus.

The ACOG policy statement further observes that "second trimester transvaginal instrumental abortion is a safe procedure." It concludes:

> Terminating a pregnancy is performed in some circumstances to save the life or preserve the health of the mother. Intact D & X is one of the methods available in some of these situations. A select panel convened by ACOG could identify no circumstances under which this procedure, as defined above, would be the only option to save the life or preserve the health of the woman. An intact D & X, however, may be the best or most appropriate procedure in a particular circumstance to save the life or preserve the health of a woman, and only the doctor, in consultation with the patient, based upon the woman's particular circumstances can make this decision.

The American Medical Association has also described the intact D & E procedure. A Report of the Board of Trustees concerning "Late–Term Pregnancy Termination Techniques" notes that "the term 'partial birth abortion' is not a medical term." Dr. Christensen agrees that "partial birth abortion" is not a medical term but in his first affidavit presented to this Court in support of a temporary restraining order he further states: "I have provided abortion services for twenty-five years; I read the medical literature and keep up with current developments in this field and I know of no procedure called 'partial birth abortion'." The Report goes on to state that the AMA "will use the term 'intact dilation and extraction' (or intact D & X) to refer to" the procedure described by ACOG above. *See* Bd. Report at 15. The AMA notes that:

> According to the scientific literature, there does not appear to be any identified situation in which intact D & X is the only appropriate procedure to induce abortion, and ethical concerns have been raised about intact D & X. The AMA recommends that the procedure not be used unless alternative procedures pose materially greater risk to the woman. The physician must, however, retain the discretion

to make that judgment, acting within standards of good medical practice and in the best interest of the patient.

*Id.*

After the first trimester, the main alternative to a D & E abortion is an induction procedure in which the physician uses medications to induce preterm labor. In a medical induction the physician uses laminaria to dilate the cervix and introduces medications into the patient that will induce labor. Induction abortion involves the same medical complications as labor and delivery at full-term, and the procedure must be performed in a hospital or hospital-like setting. Inductions cannot usually be performed before sixteen weeks LMP. If an induction is unsuccessful the physician must perform a D & E or collapse the calvarium to allow it to pass through the cervix. During inductions fetal demise can occur at different times and from different causes. During an induction procedure, the fetus may partially emerge through the cervix while it is still "living."

The remaining procedures for performing an abortion are hysterotomy or hysterectomy, which are major surgical procedures that require hospitalization and are rarely performed because of the risks they may pose. A hysterotomy is essentially a Cesarean section performed before term. Hysterotomy presents greater medical risks than a Cesarean section performed at term due to the thickness of the uterus and surrounding musculature. It also may cause uterine rupture during future pregnancies, and it necessitates the use of a Cesarean section for future births. A hysterectomy involves the complete removal of the patient's uterus and leaves the woman unable to bear children. The morbidity associated with hysterectomy and hysterotomy is more than seven times that associated with induction. The mortality rate associated with hysterectomy and hysterotomy is more than seven times that associated with induction, and more than ten times that associated with D & E.

*Affidavits In Support of Preliminary Injunction.* In support of their motion for a temporary restraining order and the present motion for a preliminary injunction, plaintiffs submitted affidavits of Drs. Philip Darney,

Bernard Smith, Dennis Christensen, Neville Sender, Gavin Jacobson and Fredrik Broekhuizen. Each doctor declares that he knows of no medical procedure called "partial-birth abortion" and that he does not know if the phrase "partially vaginally delivers" as used in the Act means "to deliver a part of a fetus into the vagina" or "to deliver an intact fetus part way into the vagina." Each doctor believes Act 219 could be construed to apply to most commonly-used abortion techniques and each offers a similar explanation as to how this might occur. Broekhuizen's explanation is illustrative:

> The definition of "partial-birth abortion" in AB220 [Act 219] is so broad that it potentially covers many D & Es. Any D & E may fall within AB220's prohibition because in performing a D & E, I may pull a part of the fetus through the cervical os (opening) while the fetus still shows signs of life and before I complete the procedure and thereby cause the death of the fetus. This may happen in several ways. First, when I rupture the amniotic sac, a fetal part may protrude through the cervical os. Second, when I suction out the amniotic fluid, a part of the fetus may be drawn out with the suction and protrude through the cervical os. Third, sometimes in using forceps to extract the fetus, I draw a presenting part of the fetus down into the vagina before it is disarticulated. Fourth, even when the part I pull into the vagina is disarticulated, the drawing out of a fetal part with forceps that occurs before fetal demise could be considered a "partial delivery" because I am "delivering" or drawing out, a part of the fetus . . . .

> AB220's proscription reaches so broadly as to encompass some abortions performed by induction. During an induction the fetus is occasionally partially vaginally delivered before fetal demise. I take a variety of medical steps (such as: breaking the amniotic sac, digitally assisting the expulsion of the fetus), and these are frequently maneuvers that cause fetal demise. In some cases, I may begin an induction with the fetus being delivered in a breech presentation (feet first), but the skull becomes entrapped in the cervix. In that case, I would usually allow the woman to labor for a while to see if the head will deliver on its

own. Eventually, however, especially if the woman starts to bleed or there are other medical indications, I would have to compress the skull to complete the delivery. Yet, at that point, there still may be a fetal heartbeat.

> Indeed, AB220 is so broadly worded that it could even be construed as reaching some vacuum aspiration procedures. For example, it would be conceivable to read AB220 as encompassing those situations in which I make multiple passes into the uterus with the suction cannula. In the first pass, I could remove a substantial portion of the fetus, but the remaining parts could include a beating heart. AB220 could also conceivably be read to reach situations in which I begin a vacuum aspiration procedure and then must use forceps to remove remaining parts of the fetus where these parts include a beating heart.

Broekhuizen Affidavit, paragraphs 10–12.

Christensen's affidavit also raises concerns about the possibility that the Act would proscribe certain emergency abortion procedures he performs. He explains:

> In addition, the emergency abortions I perform could also fall under the Act. Although some of those abortions are performed to save women's lives, the procedures that I use are not the only available procedures that would do so. For example, if a pregnant woman needs an abortion because of renal failure, I could perform a hysterotomy to save her life. That procedure, however, would pose significantly greater risks to the woman's health than the suction curettage or D & E procedure that I would otherwise perform. Moreover, I perform some emergency suction curettage and D & E abortions because of threats to the women's health. I understand that all of these emergency abortions could fall within the Act and subject me to prosecution.

Christensen Affidavit, paragraph 21. He also opined that "The terms of the Act extend its reach to almost all abortion procedures", this, regardless, of the legislative note which refers to its exclusion during the first trimester. His affidavit in reply sug-

gests "In summation, all the ways of avoiding prosecution under the Act require me to practice sub-optimal medicine by imposing additional health risks on my patients." He then cites perhaps that gravest of health risks: a trip to Chicago, where physicians apparently engage in unlimited abortion practice.

*Affidavits in Opposition.* Defendant intervenors submitted affidavits of Doctors Kathi A. Aultman, Steven E. Calvin, Alfred D. Fleming, Curtis Cook and Watson A. Bowes Jr., in opposition to plaintiffs' motion for a preliminary injunction. All of the doctors agree Act 219 is sufficiently clear to give a person of normal intelligence notice of what it prohibits. They read the statute to use commonly understood terms in normal ways and they rely on standard dictionaries for the meaning of these terms. Based on their interpretation of the statute they state that "[t]o partially deliver a fetus and violate the ban, the physician would deliberately and intentionally manipulate the body of the intact, living child partially out of the body of the mother for the purpose of performing a procedure intended to kill the child, and then kill the child." Each of the doctors interprets "partial-birth abortion" as defined in the statute to refer only to the intact D & E procedure. They agree that Christensen accurately describes this procedure in his affidavit.

All of the doctors also agree that in their professional opinion, Act 219 will not cause severe and irreparable harm to women in Wisconsin. As Bowes states, "In every situation where the life of the mother is not at risk—an exception permitted by the Act—the proposed procedure may be safely varied to avoid the prohibitions of the Act ... and/or commonly used, safe alternative abortion procedures may be used." Bowes Affidavit, paragraph 29. Each of the doctors concurs in this statement.

*Affidavits in Reply.* Plaintiffs offered additional declarations of Darney and Christensen for the purpose of rebutting the suggestion by the intervenors' declarants that physicians may safely alter existing abortion methods or use alternative abortion methods to avoid the prohibitions of Act 219. Darney describes three procedures he believes doctors could employ to avoid the risk of par-

tially vaginally delivering a fetus that is not known to be dead. Each of these procedures (injecting into the amniotic sac a substance toxic to the fetus, cutting or clamping the umbilical cord, or crushing the skull of the child at the outset of the procedure) is designed to kill the child before any part of it is removed from the uterus. He explains that with each procedure there is an increased risk of complications such as causing an infection, uterine perforation, or blood clotting. Also, with at least some of these procedures, it is possible that a portion of the fetus will drop out of the cervix while the physician is performing the procedure.

Christensen's affidavit explains a statement he made in a press release, apparently with an understanding that it requires some additional background. Christensen ceased performing abortions when this Court refused to issue a temporary restraining order. On May 20, 1998 defendant Nicks gave Christensen "written assurance" that she "would not bring prosecutions relating to first trimester abortions." She noted that Christensen had advised her that "the term 'first trimester' encompasses a period consisting of less than 15 menstrual weeks." On May 21, 1998 Christensen issued a press release stating that he intended to resume providing a full range of abortion services through the 24th menstrual week of pregnancy. For post-first trimester abortions he announced that he intended to alter his surgical technique to avoid prosecution under the Act "even if the change results in a sub-optimal procedure which increases the risks." Christensen's reply affidavit explains this statement from his press release.

Christensen states that he altered his abortion technique by taking steps "to ensure fetal demise prior to fetal extraction." He describes the same options for accomplishing this task as Darney. He further notes that "[a]lthough I believe each alternative can be safely performed, each is also riskier than a procedure done without a requirement of inducing fetal demise."

Although plaintiffs challenge the credibility of opposing affiants based on their limited participation in abortion procedures and minor variances in statements in other proceed-

ings, nonetheless, on balance, the Court finds these affidavits more credible than the sworn statements of plaintiff doctors typified by Dr. Christensen whose self-serving statements suggest a lack of objectivity and a desire to create a conflicting response at any turn when he believes the need to arise.

## MEMORANDUM

To obtain a preliminary injunction plaintiffs must establish that (1) they have some likelihood of success on the merits and (2) there is no adequate remedy at law and they will suffer irreparable harm if preliminary relief is denied. *Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir.1992). The Court previously found that plaintiffs might succeed on the merits of their claim. *See* Memorandum and Order dated May 12, 1998, at 7. However, that determination necessarily rested solely upon the materials plaintiffs submitted in support of their motion for a temporary restraining order. Defendants and proposed intervenors have now had an opportunity to· respond to plaintiffs' submissions and plaintiffs have offered their reply. Upon due consideration of all of the evidence and arguments before it the Court now concludes plaintiffs have failed to carry their burden of proof concerning their likelihood of success on the merits of this dispute. Moreover, plaintiffs have also failed to demonstrate a credible threat of irreparable harm flowing from enforcement of the Act. Accordingly, plaintiffs' motion for a preliminary injunction must be denied. *See Abbott Laboratories*, 971 F.2d at 11 (Court's inquiry is at an end if moving party cannot. establish one of the prerequisites for a preliminary injunction).

*Likelihood of Success on the Merits*

Plaintiffs' constitutional challenge to 1997 Wisconsin Act 219, formerly AB220, rests primarily on their contention that the language of the Act is hopelessly vague. They argue because the phrase "partial-birth abortion" is not a phrase commonly used in the medical community it is not clear what the legislature meant by "an abortion in which a person partially vaginally delivers a living child, causes the death of the partially delivered child with the intent to kill the child, and then completes the delivery of the child." They particularly take issue with the phrase

"partially vaginally delivers," in which they find the possibility for both a broad and a narrow interpretation of the Act. Under their overly broad interpretation the phrase "partially vaginally delivers" refers to "situations where detached portions of a fetus are 'delivered' into the birth canal." *See* Plaintiffs' Brief in Support at 15. Under their narrow interpretation the phrase refers to "situations where a portion of the fetus is 'delivered' into the birth canal while the fetus is intact." *Id.* Plaintiffs contend the wording of the Act is too vague to give them notice of which interpretation the legislature intended.

Plaintiffs build their overbreadth challenge upon their broad reading of Act 219. Originally they argued that broadly construed the Act would ban nearly every commonly used abortion procedure because with each such procedure it is possible that a portion of the fetus is detached and removed. vaginally while the portion not removed continues to live inside the mother. Accordingly, they contend the Act could reach conventional D & E's, induction and even suction curettage. They argue that a ban so broad imposes an undue burden upon women's rights to terminate a pregnancy. Such a ban is further constitutionally infirm, they contend, because it does not recognize an exception to protect the health of the mother. It seems plaintiffs have now managed to understand the Act in a manner that allows them to continue the abortion business as usual. Their altered positions are reflected in Christensen's reply affidavit as previously noted.

 *Legal Standards.* A penal statute will survive a vagueness challenge if it defines an offense with sufficient definiteness that people of ordinary intelligence can understand what conduct is prohibited and if it defines the conduct in a manner that does not encourage arbitrary and discriminatory enforcement. *United States v. Jackson*, 983 F.2d 757, 764 (7th Cir.1993). A scienter requirement significantly diminishes a statute's susceptibility to discriminatory enforcement. *Id.* at 765. When a federal court examines a state statute for vagueness, it must strive to interpret the statute in the manner the state's courts would interpret it. *K–S Pharmacies, Inc. v. American Home*

*Products Corp.,* 962 F.2d 728, 730 (7th Cir. 1992).

The goal of statutory interpretation in Wisconsin is to give effect to the intent of the Legislature. *State Dept. of Natural Resources v. City of Waukesha,* 184 Wis.2d 178, 515 N.W.2d 888, 892 (1994). Wisconsin presumes that the plain meaning of a statute is the best indicator of the Legislature's intent. *Id.* Accordingly, if a statute is clear and unambiguous on its face, the court need look no further and must apply the statutory language as it is written. *Id.* In the absence of a statutory definition, words of a statute are to be construed according to their common and approved usage. *N.E.M. by Kryshak v. Strigel,* 208 Wis.2d 1, 559 N.W.2d 256, 258 (1997). A court may use a dictionary to determine the common and approved usage of words appearing in a statute. *Id.*

In construing a statute, Wisconsin courts strive to give it an interpretation that preserves its constitutionality. *See Demmith v. Wisconsin Judicial Conference,* 166 Wis.2d 649, 665 fn. 13, 480 N.W.2d 502 (1992) ("The court must interpret a statute, if at all possible, in a manner that will preserve the statute as a constitutional enactment."); *State v. Cissell,* 127 Wis.2d 205, 215, 378 N.W.2d 691 (1985) (There is a strong presumption favoring the constitutionality of a legislative enactment, and "[t]his court will construe the statute to preserve it if it is at all possible."); *Browne v. Milwaukee Bd. of Sch. Directors,* 83 Wis.2d 316, 331, 265 N.W.2d 559 (1978) (When a legislative enactment is attacked as being unconstitutional, "the cardinal rule of statutory construction is to preserve a statute and to find it constitutional if it is at all possible to do so." (citations omitted)); *State ex. rel. Harvey v. Morgan,* 30 Wis.2d 1, 13, 139 N.W.2d 585 (1966) ("the duty of this court is not to impugn the motives of the legislature, but rather, if possible, to so construe the statute as to find it in harmony with accepted constitutional principles."). This Court must do the same.

*Plain Meaning of Act 219.* Plaintiffs' alleged confusion concerning the meaning of Act 219 is a demon of their own creation.

The meaning of Act 219 is clear on its face, and only plaintiffs' narrow interpretation of the Act is consistent with that language. To "partially vaginally deliver a living child" is to deliver an intact child partially out of the uterus while another part of the intact child remains in the uterus. Accordingly, to perform a "partial-birth abortion" as defined by the Wisconsin legislature is to intentionally perform an intact D & E; no other procedure fits the language of the Act. *See* Christensen Affidavit ("The intentional removal of the fetus intact is what distinguishes an intact D & E procedure from a D & E procedure"). Further, despite plaintiffs' feigned ignorance, the phrase "partial-birth abortion" *is* understood in the medical community; it is understood by both the American College of Gynecologists (of which plaintiffs are "fellows") and the American Medical Association to refer to the intact D & E procedure. *See* ACOG Statement of Policy and AMA Board of Trustees Report at 15. Christensen's assertion that he knows of no procedure referenced by the phrase "partial-birth abortion" is simply incredible.

Plaintiffs arrive at their broad interpretation of Act 219 only by equating "a living child" with "dismembered portions of a living child." This Court, the Wisconsin Legislature [1] and common sense reject such an interpretation. Dismembered body parts are neither a "child" nor are they "living" in the ordinary meaning of those words. Moreover, plaintiffs ignore the fact that the subject of Act 219 is abortions involving partial "births"—a term readily applied to the partial delivery of an intact child but hardly applicable to the delivery of dismembered body parts. *See Random House Dictionary of the English Language,* 213 (2nd Ed. Unabridged 1987) (defining "birth" as "1. An act or instance of being born: *the day of his birth.* 2. The act or process of bearing or bringing forth offspring; childbirth; parturition: *a difficult birth.*"); *Black's Law Dictionary* 169 (6th Ed.1990) ("Birth. The act of being born or wholly brought into separate existence").

---

1. The Legislature defined "child" to mean "a human being from the time of fertilization until it is completely delivered from a pregnant woman." Nothing in this definition suggests dismembered body parts constitute a "child."

To say it again to the Christensens of the world who dance to their own drummer, a person who "partially, vaginally delivers a living child" conducts a partial delivery of a still intact child into the vagina. Objectivity is the standard, not the subjective creations pursued by those who oppose the Act. The child is partially delivered *intact;* not in serials, not in installments, not in parts but as a whole. That is the fair and ordinary meaning of the language of Act 219. Accordingly, that is the meaning the Court must give it. *See N.E.M. by Kryshak v. Strigel,* 208 Wis.2d 1, 559 N.W.2d 256, 258 (1997). Because plaintiffs have not argued that the statute so construed is susceptible to discriminatory enforcement, *see United States v. Jackson,* 983 F.2d 757, 764 (7th Cir.1993) (scienter requirement in clear statute significantly diminishes threat of discriminatory enforcement), plaintiffs' vagueness argument necessarily fails.

Plaintiffs contend the defendant's interpretation of Act 219 misconstrues the legislative intent behind the Act. They cite the legislative history of Act 219 as evidence that the Wisconsin Legislature intended the Act to ban more than just Intact D & E procedures. Specifically, they note that the Legislature rejected certain amendments that described in greater detail than Act 219 the steps involved in an intact D & E. Proposed Assembly Amendment 4, for example, defined partial-birth abortion as follows:

(b) "Partial-birth abortion" means a procedure consisting of the following sequence of acts:

1. The uterine cervix of a pregnant woman is dilated.

2. The child is rotated so that its feet are the presenting part.

3. The feet of the child are pulled past the vaginal introitus and the arms and shoulders of the child are passed through the uterine cervix.

4. A scissors is used to pierce the base of the skull of the child.

5. A suction curette is inserted into the opening at the base of the skull made by the scissors and the cranial contents are suctioned from the skull.

6. The skull of the child is crushed or collapsed.

7. Delivery of the child is completed.

Proposed Senate Amendment 5 was identical. Plaintiffs contend the Legislature's rejection of these amendments requires the Court to give Act 219 a broader reading.

■ Plaintiffs' argument lacks merit. In the first instance, the Court need not concern itself with legislative history where, as here, the intent of the Legislature is clear on the face of the Act. *See Burnett v. Hill,* 207 Wis.2d 110, 557 N.W.2d 800 (1997) (resort to extrinsic aids to interpretation is appropriate only when statutory language is ambiguous); *see also Shroble v. Prusener,* 185 Wis.2d 102, 517 N.W.2d 169 (1994) (plain language of statute is the best indicator of legislative intent). Moreover, plaintiffs read too much into the Legislature's rejection of the proposed amendments. Legislators probably rejected the proposed amendments because they perceived them as inadequate to prohibit the intact D & E procedure. For example, a ban worded in as much detail as proposed Assembly Amendment 4 could have been easily avoided with non-traditional means of killing. It would have also allowed a doctor to perform an Intact D & E procedure on any child who was already in the breech position and who did not require rotation. Similarly, it would have allowed a doctor to partially remove a child from the uterus up to *but not including* the shoulders, and then kill the child. A proposed law so easily avoided is reasonably rejected by the Legislature. Accordingly, the Court cannot agree with plaintiffs that the decision to reject the proposed amendments to AB220 meant the Legislature intended to ban more than just intact D & E or other protected procedures. In light of the plain language of Act 219, plaintiffs' legislative history argument is unpersuasive.

■ Moreover, plaintiffs' argument based on their broad interpretation of Act 219 is also unpersuasive. All plaintiffs have managed to show is that their broad construction of the Act is likely unconstitutional. However, the Court is obligated to adopt a narrow construction of a law if such a construction is consistent with the statutory language and would save the law from a declaration of unconstitutionality. *See Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (choosing a narrow construction of a

campaign finance statute where the broader construction would be unconstitutionally vague and would reach constitutionally protected issue advocacy). As indicated, a narrow construction of Act 219 is not only possible but is the only construction that fits the language the legislature adopted. Moreover, from the evidence before it, the Court sees little chance that Wisconsin's partial-birth abortion ban narrowly construed might be declared unconstitutional.

*Constitutionality of the Plain Meaning of Act 219.* To show a likelihood of success on the merits, plaintiffs rely heavily on the fact that no other state law banning partial-birth abortion has survived a constitutional challenge, citing numerous other cases. However, having reviewed these cases the Court believes Act 219 is unique among laws previously considered by federal courts because (1) it prohibits only intact D & E procedures, and (2) it includes a scienter requirement. *Compare Women's Medical Professional Corp. v. Voinovich,* 130 F.3d 187 (6th Cir. 1997); *Hope Clinic v. Ryan,* 995 F.Supp. 847 (N.D.Ill.1998); *Planned Parenthood v. Woods,* 982 F.Supp. 1369 (D.Ariz.1997). The Court illustrates the importance of these features of the law to preserve its constitutionality by reference to the facts and arguments raised by the parties and those advanced in *Evans v. Kelley,* 977 F.Supp. 1283 (E.D.Mich.1997). The Court relies on that case in particular because it offers a detailed factual record and involves at least one of the plaintiffs appearing in this case—plaintiff Christensen. Moreover, the parties have not brought to the Court's attention material facts from other cases substantially different from those found in *Evans* by the Honorable Gerald E. Rosen, U.S. District Court Judge for the Eastern District of Michigan.

The Michigan statute considered in *Evans* defined partial-birth abortion as:

> an abortion in which the physician ... partially vaginally delivers a living fetus before killing the fetus and completing the delivery.

*Id.* at 1290. As interpreted by Judge Rosen Michigan's law imposed a broad ban on abortion techniques, including conventional D & E's as well as intact D & E's. For reasons this Court has stated, Wisconsin's law may not be so interpreted. Moreover, Michigan's law had no scienter requirement which is a part of Wisconsin's law. These are crucial differences.

■ *Scienter.* The scienter requirement in Wisconsin's law protects physicians against inadvertent violations of the law.[2] Judge Rosen in *Evans* explained how inadvertent violations of Michigan's law might occur:

> Dr. Giles testified that he believed that the Michigan statute prohibited only a vaginal delivery of an intact fetus with the intent of killing the fetus before delivery is completed. Therefore, he opined that where a doctor is performing a conventional D & E and manages to pull the fetus out intact up to the head, compressing the skull with forceps, with the knowledge that the compression might kill the fetus, would not be violating the statute because "the intent to kill the fetus would not be there". However, when the Court asked Dr. Giles to review the statute and the doctor found no intent to kill requirement, he admitted, that he could understand how some doctors might interpret the statute as covering the conventional D & E scenario discussed above.

*Id.* at 1300 (citations to the trial transcript omitted). Judge Rosen went on to comment that even if Michigan's statute could be construed as covering only intact D & E procedures, the absence of an intent requirement is a "serious problem" because "a doctor may begin a procedure by intending to do a conventional D & E but end up doing an 'intact' D & E, thus triggering the statute." *Id.* at 1308.

Plaintiffs in this matter raise similar concerns. They contend that a physician performing a conventional D & E procedure might violate Act 219 if, by rupturing the amniotic sac, he or she causes a part of the child's body to protrude through the cervical

---

2. The scienter requirement has the added benefit of mitigating any vagueness physicians may find in the law and any potential *for* discriminatory enforcement. *See Colautti v. Franklin,* 439 U.S. 379, 395, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979); *United States v. Jackson,* 983 F.2d 757 (7th Cir. 1993).

os. Alternatively, plaintiffs suggest that when a physician suctions out amniotic fluid as part of a conventional D & E, a part of the child may be drawn out with the suction and protrude through the cervical os. Darney in his reply affidavit similarly worries that a physician trying to kill a child before removing it from the uterus may accidentally cause a part of the child to drop out of the cervix. Concerning each of these scenarios plaintiffs contend physicians would violate Act 219 if they subsequently killed the child and then completed delivery.

Because Wisconsin's partial-birth abortion law includes a scienter requirement, it will not ensnare physicians who inadvertently violate the law. Indeed, the scienter requirements in Wisconsin's law are abundant. Under the Michigan statute a physician performing a partial-birth abortion need only "kill[ ] the fetus." In Wisconsin, the physician must "cause[ ] the death of the partially delivered child with the intent to kill the child." Moreover, a physician violates the Wisconsin law only if he or she "*intentionally* performs a partial-birth abortion." *See* 940 .16(2) (emphasis added). Accordingly, the concern that a doctor might be liable if he or she intends to perform a conventional D & E or an induction but ends up performing an intact D & E is wholly and adequately addressed in Wisconsin's law. Likewise, plaintiffs' concern that a doctor who inadvertently causes a portion of a child to protrude out of the cervix will be subject to the Act is unfounded. Such a doctor lacks the intent to perform a partial-birth abortion and is not subject to the law.

■ *Safety of Alternatives.* The narrowness of the ban Wisconsin adopted also favors upholding its constitutionality. Based on their broad reading of the statute plain-

tiffs contend Wisconsin's law forces women in the second trimester of their pregnancies to use risky and burdensome abortion procedures such as hysterotomy or hysterectomy. They contend a ban so broad imposes an undue burden on a woman's right to choose to terminate her pregnancy. This argument invokes the rule of law from the plurality opinion in *Planned Parenthood v. Casey,* 505 U.S. 833, 878, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), which held that a law imposes an undue burden on a woman's right to terminate her pregnancy if the purpose or effect of the law is to place in a woman's path a substantial obstacle to obtaining an abortion before the child she is carrying attains viability.[3] A similar argument was raised in *Evans,* where Judge Rosen found that Michigan's ban on conventional and intact D & E's was unconstitutional because induction, hysterotomy and hysterectomy techniques were riskier than the banned procedures. However, neither plaintiffs nor *Evans* address the constitutionality of a partial-birth abortion law that bans only intact D & E's. That is the only real issue before this Court.

Absent from the record is a showing that intact D & E's are safer in any significant way from conventional D & E's. Both the American Medical Association and the American College of Gynecologists recognize that a ban on intact D & E's leaves women with other appropriate abortion options.[4] Moreover, the Court has before it the affidavits of five physicians stating that "[i]n every situation where the life of the mother is not at risk—an exception permitted by the Act— the proposed procedure may be safely varied to avoid the prohibitions of the Act ... and/or commonly used, safe alternative abortion procedures may be used." Although plaintiffs attempt to rebut this assertion,

**3.** For purposes of this preliminary injunction motion only defendants do not contest the applicability of the "undue burden" test to plaintiffs' facial challenge to the constitutionality of Act 219. However, they observe that in *U.S. v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) the Supreme Court held that a statute is unconstitutional on its face only if no set of circumstances exists under which the statute would be valid. The post-*Casey* applicability of the *Salerno* standard is unresolved. *See e.g. Women's Medical Professional Corp. v. Voinovich,* 130 F.3d 187, 194 (6th Cir.1997). Nevertheless,

if a statute is constitutional under the "undue burden" standard, it is necessarily constitutional under *Salerno* as well.

**4.** The AMA's survey of the scientific literature found "no identified situation in which [intact D & E] is the only appropriate procedure to induce abortion." The American College of Gynecologists likewise stated that it "could identify no circumstances under which [intact D & E's] ... would be the only option to save the life or preserve the health of the woman."

they fail. Darney and Christensen's reply affidavits point out that attempting to kill a child before delivering it increases the risks to a woman's health. However, both doctors proceed on the assumption that the only way to avoid the proscriptions of Act 219 is to kill the child before performing an abortion. As explained, that assumption is built upon a flawed construction of the statute. Because these riskier procedures are not necessary to avoid violating the law, they do not render the law unconstitutional.

The conclusion that conventional D & E's are as safe as intact D & E's is supported by *Evans.* In dicta Judge Rosen found that intact D & E's are generally safer than conventional D & E's. He observed:

> The intact procedure reduces the risk of uterine perforation and cervical lacerations because, removing the fetus intact, rather than in pieces, entails less instrumentation of the uterus and minimizes the passage of bony fetal fragments through the cervix and vagina. Removing the fetus intact also reduces the risk of a free-floating head, an uncommon, but significant complication of a conventional D & E.

*Id.* at 1296. At the same time, however, Judge Rosen stated that "the evidence at trial established that the D & E is one of, if not the, safest method of post-first trimester abortions," *id.* at 1318, and that Doctors Evans, Westoff, Johnson, Giles and Cook agreed that "the D & E procedure is a safe procedure." *Id.* at 1294. Judge Rosen further reported that of the 60,000 abortions plaintiff Christensen had performed, approximately 15% were post-first-trimester abortions. *Id.* at 1286. Nearly all of these 9,000 abortions were performed by the conventional D & E method. *Id.* In his entire career, Christensen has performed "less than a dozen" intact D & E's. *Id.* To this Court Christensen has stated that he performs perhaps one or two intact D & E abortions each year. *See* Christensen Affidavit.

In the face of this overwhelming evidence the Court must conclude that preventing women from obtaining intact D & E's does not impose an undue burden on their right to obtain an abortion. Intact D & E's are no safer than conventional D & E's, and any perceived margin of safety has not led doctors to perform intact D & E's in the vast majority of cases. This objective evidence indicates that all doctors (including Christensen) find the conventional D & E procedure a safe alternative method. Moreover, five doctors testified to the safety of conventional D & E's in *Evans.*

Plaintiffs insist that an abortion restriction that does not make an exception for a woman's health is unconstitutional. The Court rejects this argument. Wisconsin's law leaves in place abortion procedures as safe as the one it bans. There is no showing of any circumstance in which an intact D & E procedure is the only procedure that would accomplish an abortion and protect a woman's health. Indeed, in discussing the emergency abortion procedures he performs even Christensen mentions only suction curetage and D & E. There is no mention of intact D & E. Accordingly, the Court concludes that no exception for the health of the woman is necessary in order to preserve the constitutionality of Act 219. In light of the availability of safe alternatives, Act 219 does not constitute an undue burden on a woman's right to terminate her pregnancy.

For these reasons, the Court concludes plaintiffs have not established a likelihood of succeeding on the merits.

*Irreparable Injury*

 Plaintiffs originally alleged that they will suffer irreparable injury in at least three ways if defendants are not enjoined from enforcing Act 219. First, they contended that as physicians, they will face the threat of prosecution for practicing their trade. Second, they contended Act 219's broad proscription will lead their patients to undergo riskier procedures and ultimately injure their health. Third, they contended the law will impinge upon the patients' constitutional rights. None of these arguments has merit.

Plaintiffs face no credible threat of prosecution. Even assuming without any basis for doing so that Act 219 could be construed in the overly broad manner plaintiffs suggested, it cannot now be applied in the manner they propose. Defendant Doyle and defendant Nicks, as representative of all the prosecutors in Wisconsin, have subscribed to the narrow interpretation of Act 219 suggested by the defendants, intervenors and accepted

today by the Court. Accordingly, there is no threat that plaintiffs will be prosecuted during the pendency of this matter for performing abortions outside the narrow bounds of this interpretation.

Nor have plaintiffs demonstrated a real threat to their patients' health or constitutional rights. Plaintiffs have identified no woman in Wisconsin who has been unable to obtain a safe abortion as a result of Act 219. Moreover, as explained, the conventional D & E procedure as well as other safe abortion procedures remain available to women in Wisconsin. There is no reason or basis upon which to argue that a woman's health or constitutional rights are in danger.

Because plaintiffs have established neither a likelihood of success on the merits nor an irreparable injury flowing from enforcement of Act 219, they are not entitled to a preliminary injunction. State laws are entitled to a presumption of constitutionality. Wisconsin's attempt to ban a gruesome and less than humane procedure which physicians occasionally use to kill a child partially born into this world must be accorded the deference it deserves.

*Consent*

 Plaintiffs also allege Act 219 is unconstitutional because its civil liability provisions effectively require a woman to obtain the consent of the child's father (or of her own parents if she is a minor) before she undergoes a partial-birth abortion. Such a consent requirement constitutes an undue burden on women's rights to terminate their pregnancy, they argue, citing *Casey,* 505 U.S. at 898, 112 S.Ct. 2791 (striking a spousal consent requirement as unconstitutional). However, to the extent the law makes a doctor civilly liable for conduct that the law also declares criminal activity (intentionally performing a partial-birth abortion), the Court sees no grounds for plaintiffs' constitutional challenge. If the law criminalizing partial-birth abortions is constitutionally sound, then a law imposing civil sanctions for the same activity must withstand a constitutional challenge as well. *United States v. Masters,* 924 F.2d 1362, 1367 (7th Cir.1991).

 The portion of plaintiffs' argument that has some merit is the challenge directed to § 895.038(3)(b), Wis. Stats., which autho-

rizes exemplary damages equal to three times the cost of the partial-birth abortion. Unlike § 895.038(3)(a), it does not require that the abortion be performed in violation of the criminal statute § 940.16. This oversight makes it possible for a physician who does not *intentionally* perform a partial-birth abortion but due to unanticipated circumstances does perform such a procedure to be subject to civil sanctions. Plaintiffs have demonstrated a likelihood of success in their challenge to this provision. However, statutory provisions are presumptively severable in Wisconsin, *see* sec. 990.001(11), Wis. Stats. Accordingly, the defects in § 895.038(3)(b) do not require the Court to issue an injunction against enforcement of the remaining provisions Wisconsin adopted in Act 219.

*Eighth Amendment*

Plaintiffs concede that their challenge to Act 219 based on the Eighth Amendment's prohibition against cruel and unusual punishment is not ripe for review. Accordingly, it will be dismissed.

### ORDER

IT IS ORDERED that plaintiffs' motion for a preliminary injunction is DENIED.

IT IS FURTHER ORDERED that plaintiffs' Eighth Amendment Claim is DISMISSED without prejudice and Section 895.038(3)(b) is severed and declared unconstitutional.