**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

RICHMOND MEDICAL CENTER FOR
WOMEN; WILLIAM G. FITZHUGH, M.D.;
HILLCREST CLINIC; HERBERT C. JONES,
JR., M.D.; PLANNED PARENTHOOD OF
METROPOLITAN WASHINGTON, DC,
INCORPORATED; VIRGINIA LEAGUE FOR
PLANNED PARENTHOOD; PLANNED
PARENTHOOD OF THE BLUE RIDGE,
Plaintiffs-Appellees,

v.

JAMES GILMORE, in his official capacity
as Governor of the State of Virginia;
DAVID M. HICKS, in his official
capacity as Commonwealth Attorney

for the City of Richmond; DONALD S.
    (CA-98-309-3)
CALDWELL, in his official capacity as
Commonwealth Attorney for the
County of Roanoke; HOWARD GWYNN,
in his official capacity as
Commonwealth Attorney for the City
of Newport News; CHARLES D.
GRIFFITH, JR., in his official capacity as
Commonwealth Attorney for the City
of Norfolk; ROBERT F. HORAN, JR., in
his official capacity as Commonwealth
Attorney for the County of Fairfax;
JAMES L. CAMBLOS, III, in his official
capacity as Commonwealth Attorney
for the County of Albemarle,
Defendants-Appellants.

No. 98-1930

Filed: June 30, 1998
11:50 p.m.

_____

**ORDER**

LUTTIG, Circuit Judge:

The General Assembly of the Commonwealth of Virginia enacted on March 12, 1998, and the Governor of the Commonwealth signed into law on April 13, 1998, Virginia's Partial Birth Abortion Act. This Act was modeled after the bill passed by the Congress of the United States on October 8, 1997, which was supported by the American Medical Association but subsequently vetoed by the President. The undisputed purpose of Virginia's Partial Birth Abortion Act is to prohibit the late-term abortion procedure in which

> the physician pulls a lower extremity into the vagina and then uses his fingers to deliver the lower extremity and then the torso followed by the shoulders and the upper extremities. At that point, the skull is lodged at the internal cervical os. Usually the dilation is insufficient for the skull to pass through. At that point, the surgeon slides his or her fingers along the back of the fetus; uses a pair of blunt curved scissors to rupture the base of the skull; and uses a suction catheter to evacuate the contents of the skull and then applies traction to the fetus to remove it from the patient.

Mem. Op. of District Court at 16-17. The Partial Birth Abortion Act is to become effective at midnight tonight.

On May 21, plaintiffs, Richmond Medical Center, Hillcrest Clinic, three branches of Planned Parenthood, and two doctors -- none of whom, according to their own concessions and the findings of the district court, performs this procedure -- sought an injunction from the federal district court in the Eastern District of Virginia barring the Commonwealth and its officials from enforcing the Act. The plaintiffs contended that the Act is unconstitutionally vague and also imposes a facially unconstitutional burden on the abortion rights of the women of the Commonwealth of Virginia. The Governor of Virginia and six of the Commonwealth's Attorneys were named as defendants to the lawsuit and vigorously defended the constitutionality of the statute on behalf of the citizens of Virginia. On June 25, following hearings before the district court, that court granted the preliminary injunction

2

and, on June 29, declined to stay its order pending appeal to this court.

This morning, the Commonwealth filed with me as a single Circuit Judge an application pursuant to Federal Rule of Appellate Procedure 8 to stay the district court's preliminary injunction pending appeal. I requested that the plaintiffs respond to the Commonwealth's submissions by 3:00 p.m. this afternoon. Having received and reviewed the submissions of both parties, together with the opinion of the district court, for the reasons stated I hereby grant the stay of the district court's injunction requested by the Commonwealth of Virginia.

I.

Section 18.2-74.2(A) of the Virginia Code, which is entitled "Partial Birth Abortion Prohibited," provides as follows:

> Notwithstanding the provisions of §§ 18.2-72, 18.2-73 and 18.2-74, a physician shall not knowingly perform a partial birth abortion that is not necessary to save the life of a mother. A violation of this section shall be punishable as a Class I misdemeanor.

Va. Code § 18.2-74.2(A). A partial birth abortion is defined as

> an abortion in which the person performing the abortion deliberately and intentionally delivers a living fetus or a substantial portion thereof into the vagina for the purpose of performing a procedure the person knows will kill the fetus, performs the procedure, kills the fetus and completes the delivery.

Id. § 18.2-74.2(D). Like Congress in enacting the federal statute on which Virginia's is modeled, the General Assembly of Virginia in enacting section 18.2-74.2 intended to prohibit partial birth abortions, otherwise known as the "intact dilatation and extraction" method of abortion, see, e.g., Helen Dewar, AMA Backs "Partial Birth" Abortion Curb, Wash. Post, May 20, 1997, at A1 ("the procedure called `partial birth abortion' . . . [i]s medically known as intact dilation and extrac-

3

tion"); Mem. Op. at 49 (explaining that AMA understood essentially identical definitional language in federal bill to refer only to intact D&X procedure); id. at 4 (noting that American College of Obstetricians and Gynecologists equates "partial birth abortion" with "intact D&X"). As described by the American College of Obstetricians and Gynecologists, similarly to the description recited by the district court and quoted above, this method of abortion includes the following four elements:

> 1. Deliberate dilatation of the cervix, usually over a sequence of days;

> 2. Instrumental conversion of the fetus to a footling breech;

> 3. Breech extraction of the body excepting the head;

> 4. Partial evacuation of the intracranial contents of a living fetus to effect vaginal delivery of a dead but otherwise intact fetus.

American College of Obstetricians and Gynecologists Statement of Policy (quoted in Mem. Op. at 4-5).

Plaintiffs concede, and the district court found, that they do not perform this procedure. Furthermore, as explained below, the plain language of section 18.2-74.2(D) cannot reasonably be read to prohibit the particular procedures that plaintiffs actually do perform. Therefore, the district court's conclusion that the plaintiffs faced a reasonable fear of prosecution under section 18.2-74.2(D), and thus had standing to challenge that provision, was simply in error. See Babbitt v. United Farm Workers Nat'l Union , 442 U.S. 289, 298 (1979).

II.

Section 18.2-74.2(D), which provides the statutory definition of a partial birth abortion, sets forth the elements necessary in order to establish a violation of Virginia's Partial Birth Abortion Act. As relevant here, to violate the statute, an abortion provider must (1) deliver

4

an intact fetus or a substantial portion thereof, (2) while the fetus is living, (3) into the vagina. In addition, in provisions barely mentioned by the district court, the statute also includes two critical mens rea requirements. Thus, the statute does not prohibit the mere delivery of a living fetus or substantial portion thereof into the vagina, but, rather, prohibits only the deliberate and intentional delivery of such a fetus into the vagina. Indeed, even the intentional and deliberate delivery of a living fetus into the vagina does not violate the statute unless such delivery is for the specific purpose of performing a procedure the provider knows will kill the fetus. Cf. Planned Parenthood v. Doyle, 1998 WL 299912, at *6 (W.D. Wis.) ("To partially deliver a fetus and violate the ban, the physician would deliberately and intentionally manipulate the body of the intact, living child partially out of the body of the mother for the purpose of performing a procedure intended to kill the child, and then kill the child.") (quoting medical testimony).

When the statute is thus understood -- with both its actus reus and explicit mens rea requirements appreciated-- the unreasonableness of the district court's construction of the statute is apparent. The district court held that section 18.2-74.2(D) could reasonably be construed to prohibit abortions performed by suction curettage and conventional dilatation and evacuation procedures, the two most common methods of abortion during the first two trimesters of pregnancy, see, e.g., Mem. Op. at 80; id. at 10-11, both of which methods are apparently performed by the plaintiffs, see id . at 6-7. The district court thus held, in effect, that section 18.2-74.2(D) was so vague as potentially to prohibit nearly every abortion performed in the Commonwealth of Virginia. An examination of the suction curettage and dilatation and evacuation methods of abortion makes clear, however, that section 18.2-74.2(D) cannot reasonably be read to prohibit these procedures, and therefore that the plaintiffs do not face a reasonable fear of prosecution under the statute.

A.

In the suction curettage procedure, a physician inserts a tube or cannula (which is attached to a vacuum generator) through the vagina and into the uterus and then removes the fetus piecemeal by means of negative suction. Because such suction may occasionally detach

5

the entire fetus, or identifiable parts thereof, and because such parts might include cells that are still living as they pass through the vagina via the cannula and into the vacuum, the district court concluded that section 18.2-74.2(D) could reasonably be read to prohibit suction curettage. This section, however, cannot reasonably be so read.

First, the statute prohibits only the delivery of <u>intact fetuses or substantial portions</u> of intact fetuses. It does not prohibit the extraction of dismembered body parts, no matter how substantial. <u>Cf</u>. <u>Planned Parenthood</u> v. <u>Doyle</u>, 1998 WL 299912, at *9 (W.D. Wis.) (noting that similar statute in question there was explicitly directed at partial "births," a phrase "readily applied to the partial delivery of an <u>intact</u> child but hardly applicable to the delivery of dismembered body parts." (emphasis added)). Second, the statute prohibits only delivery of an intact fetus or a substantial portion thereof <u>while that fetus is living</u>. It does not prohibit extraction of a dead fetus or of detached fetal tissue that may still contain living cells. Third, the statute prohibits only the delivery of an intact living fetus (or a substantial portion thereof) <u>into the vagina</u>. It does not prohibit the removal of detached fetal parts <u>through the vagina via an enclosed cannula</u> or similar bypass. Thus, it is clear that the suction curettage method of abortion simply does not satisfy even the <u>actus reus</u> requirements set forth in section 18.2-74.2(D).

More importantly, even if one were to read these <u>actus reus</u> requirements more broadly than their plain language can bear, such that suction curettage might on occasion fall within the purview of these requirements, the provider of suction curettage, according to the plaintiffs' own testimony before the district court, would never be acting with the <u>mens rea</u> necessary to violate the statute.

The statute requires that the delivery of an intact living fetus (or a substantial portion thereof) into the vagina be both <u>deliberate</u> and <u>intentional</u>. As the testimony establishes, an abortion provider performing suction curettage cannot predict or control whether the procedure removes the fetus intact or in pieces (substantial or otherwise). <u>See</u>, <u>e.g.</u>, Mem. Op. at 21 ("the intact fetus <u>may</u> come through the cannula" (<u>quoting</u> plaintiffs' testimony)). And the effectiveness of the procedure does not depend upon the manner in which the fetus is removed. Thus, an abortion provider cannot be said to <u>deliberately</u>

6

and intentionally remove an intact living fetus or a substantial portion thereof, even if by happenstance such is the result of the procedure. Furthermore, "no effort is made to determine whether the fetus is or is not living" during the procedure. Mem. Op. at 10-11 (emphasis added); see also id. at 52-53 & n.22 (provider following "common practice" "cannot know" when the fetus dies). A provider lacking such information cannot even be said to be knowingly removing a living fetus, let alone to be doing so deliberately and intentionally.

Finally, even were the statute construed such that a provider performing this type of abortion could be said to deliver a living fetus or substantial portion thereof into the vagina deliberately and intentionally, his conduct would not be "for the purpose of performing a procedure" that "will kill the fetus." Va. Code Ann. § 18.2-74.2 (emphasis added). The provider does not deliver the fetus into the vagina in order that he may perform a subsequent procedure that "will kill" the fetus. Rather, the very act of extracting the fetus from the uterus through the cannula is itself the procedure that kills the fetus, and it is so understood. Although the cannula traverses the vagina, the fetus is not brought through the vagina for the purpose of killing it there, but only to complete the removal procedure.

B.

In the conventional dilatation and evacuation procedure, the abortion provider, in addition to using suction, typically dismembers the fetus with a pair of forceps and then removes the fetus from the uterus in pieces. Mem. Op. at 12-13. Because such a procedure occasionally results in the extraction of the umbilical cord, fetal limbs, or even an intact fetus into the vagina while the fetus is still alive, the district court held that section 18.2-74.2(D) could reasonably be construed to prohibit dilatation and evacuation in such circumstances. Once again, it is plain that the district court read this section unreasonably.

Just as an abortion provider performing suction curettage does not satisfy the actus reus elements of the statute, neither does one performing conventional dilatation and evacuation. First, the dilatation and evacuation procedure does not involve delivery into the vagina of an intact fetus or substantial portion of an intact fetus. On the contrary, whereas the statute on its face contemplates the delivery of all

7

or a substantial portion of an intact fetus into the vagina, not its delivery in pieces or separate parts, conventional dilatation and evacuation is distinguished from intact dilatation and extraction by the very fact that the former involves dismemberment of the fetus. Mem. Op. at 16 ("[A]s a general proposition, D&X is a variant of D&E but differs from classic D&E in that it [D&X] does not rely upon dismemberment to remove the fetus." (internal quotation omitted)). The error of the district court's interpretation of "substantial portion" is manifest in its conclusion that extraction of even the umbilical cord into the vagina might satisfy this element of the statute. Id. at 53 (emphasis added). Second, the fetus is usually not living when it or a substantial portion of it enters the vagina. Normally the physician severs the umbilical cord, and so kills the fetus, while the fetus is still within the uterus. Id. at 13-14. Or, alternatively, the physician may remove and extract limbs first, an act that similarly kills the fetus remaining in the uterus. Id. at 14.

Despite the fact that the vast majority of conventional dilatation and evacuation abortions do not satisfy the actus reus requirements of the Act, the district court focused on those rare cases in which a fetus (or a substantial portion thereof) enters the vagina both living and intact. However, the mens rea elements of the statute once again clearly protect abortion providers from prosecution even in these unusual circumstances.

From the plaintiffs' own testimony, it is apparent that those instances in which an intact fetus (or substantial portion thereof) emerges into the vagina are a result of "luck" rather than deliberation and intent. Mem. Op. at 85 n.37. Whether such a result occurs is beyond the provider's control. Id.; see also id. at 60; Planned Parenthood v. Doyle, 1998 WL 299912, at *3 (W.D. Wis.) ("The intentional removal of the fetus intact is what distinguishes an intact [D&X] procedure from a [conventional] D&E procedure." (internal quotations omitted)).

Likewise, as with the suction curettage procedure, the provider performing conventional dilatation and evacuation "can neither predict nor control" whether the fetus will still be living when it (or a substantial portion thereof) enters the vagina. Mem. Op. at 60 (internal quotations omitted). Thus, the provider cannot reasonably be said to have

8

deliberately or intentionally delivered a living fetus or a substantial portion thereof into the vagina. Finally, an abortion provider who performs a conventional dilatation and evacuation cannot reasonably be said to deliver a living and intact fetus, or substantial portion thereof, into the vagina for the purpose of killing the fetus there. Even on those unusual occasions when the fetus is delivered intact into the vagina, this results from an unplanned deviation from the conventional dilatation and evacuation procedure, rather than from the provider's deliberate design. The provider cannot be said to intend to kill the fetus in the vagina when he assumes that termination will occur in the uterus. Mem. Op. at 13-14.

III.

Even if there were question as to whether Virginia's Partial Birth Abortion Act could arguably be interpreted to prohibit the suction curettage and the dilatation and evacuation procedures, the Commonwealth of Virginia and the individual defendants have provided unequivocal assurances (1) that they interpret the statute to cover neither suction curettage nor conventional dilatation and evacuation procedures, (2) that they would not enforce the statute against individuals performing such procedures, and (3) that, specifically, they interpret the incidental protrusion of some part of the fetus into the vagina as insufficient to transform a conventional dilatation and evacuation abortion into an intact dilatation and extraction abortion. The Governor himself has represented in writing that individuals performing suction curettage and conventional dilatation and evacuation procedures will not be prosecuted. See Letter of Gov. James C. Gilmore, Exhibit F(1) (cited in Motion To Stay or Modify Preliminary Injunction, at 6). The Attorney General has likewise represented that the term "partial birth abortions" in the statute applies only to the intact dilatation and extraction procedure and that "conventional [dilatation and evacuation procedures]" are not subject to prosecution under the Act. Defendants' Memorandum, Exhibit 1, at 2 & n.5 (cited in Mem. Op. at 30, 47-48). And the Commonwealth's Attorneys individually have concluded that the statute covers only the intact dilatation and extraction procedure and represented that they do not intend to prosecute persons who perform either suction curettage or conventional dilatation and evacuation. Defendants' Memorandum, Exhibits 2-7, at ¶ 5 (cited in Mem. Op. at 46).

9

The district court dismissed outright all of these representations on two primary grounds: that abortion is so politicized an issue that the Commonwealth's officials cannot be expected to abide by their sworn statements to the court and that, in any event, the officials are not bound by these representations and could therefore change their views at any time. Neither of these asserted justifications warrants the summary dismissal of these solemn representations by the Commonwealth's chosen representatives. First, by suggesting that the Commonwealth's officials will yield to politics over law, the district court imputes a type of bad faith, if not lawlessness, to the State's officials without either authority or justification. Second, by categorically rejecting the statements on the ground that the Commonwealth's officials may renege on these representations and prosecute persons who perform suction curettage or dilatation and evacuation, the district court gave impermissibly short shrift to the fact that these statements were made under oath and with the knowledge and imprimatur of the Governor of the Commonwealth himself. Rather than lightly dismissing these statements, the district court instead was under an affirmative obligation, in evaluating the vagueness of the statute, to accord these submissions the respect they are due as the official representations of those whose duty it is to faithfully enforce not only the laws of the Commonwealth but also the Constitution of the United States. See, e.g., Forsyth County v. The Nationalist Movement, 505 U.S. 123, 131 (1992).

IV.

When all is said and done, it appears that, although the district court finely parsed the statute, it effectively overread those portions of the statute that it did address -- finding ambiguity where none reasonably exists -- and it actually omitted from consideration significant portions of the statute that directly bear (if not bear most directly) upon the plaintiffs' claims that section 18.2-74.2 can reasonably be understood to prohibit the suction curettage and the dilatation and evacuation procedures they perform.

Thus, for example, falling victim to what are but sophistic arguments, the district court accepted unhesitatingly that the suction of fetal cells, tissue, or parts from the uterus, through a tube or cannula that transverses the vagina, can reasonably be understood as "deliver-

10

[ing] a living fetus or a substantial portion thereof into the vagina." Likewise did it accept that this statutory phrase could be satisfied by the mere pulling of the umbilical cord into the vagina, or by the extraction of mere fetal tissue from the uterus. And, at the same time that the district court accepted these contrived arguments as to the reasonable interpretation of the statute, it ignored altogether the explicit <u>mens rea</u> limitations of section 18.2-74.2 that the provider must have delivered a living fetus or a substantial portion thereof into the vagina both "deliberately and intentionally" and "for the purpose of performing a procedure the [provider] knows will kill the fetus" -- this, despite the repeated admonitions of the Supreme Court that consideration of <u>mens rea</u> requirements is essential in the judicial consideration of vagueness challenges in particular.

When the statute is read in its entirety, <u>with both its actus reus and its mens rea limitations</u>, it is clear, contrary to the district court's conclusion, that persons of ordinary intelligence would not at all understand the statute to prohibit the procedures these plaintiffs perform. Rather, they would understand the one procedure prohibited by section 18.2-74.2 to be that of intact dilatation and extraction, or partial birth abortion -- the very procedure that the Commonwealth of Virginia sought to prohibit.

The American Medical Association's observation with respect to the almost identically worded federal partial birth abortion statute overwhelmingly passed by Congress is no less apropos of the Commonwealth of Virginia's partial birth abortion statute: It "clearly define[s] the prohibited procedure so that it is clear on the face of the legislation what act is to be banned [and therefore] physicians will be on notice as to the exact nature of the prohibited conduct." In concluding otherwise, the district court turned on its head the cardinal principle governing the federal courts in their interpretation of yet unconstrued state statutes, a principle that governs especially in the context of requests for extraordinary injunctive relief. Instead of presuming the statute constitutional and indulging the assumption, mandated by our federalism, that the State will, where necessary, construe its statutes so as to ensure their constitutionality, the district court all but presumed the statute unconstitutional and, where the slightest ambiguity in the statute's language arguably existed, assumed -- in the face of the Governor's, the Attorney General's, and the prosecutor

11

defendants' sworn representations that they would construe the statute otherwise -- that the State would adopt and enforce a construction of the statute that would render it <u>un</u>constitutional.

Accordingly, the plaintiffs having failed to establish the likely applicability of section 18.2-74.2 to the procedures they perform and thus to establish the likelihood that they will ultimately be held to have standing to pursue their action, the stay of the district court's injunction requested by the Commonwealth of Virginia is granted.

<u>It is so ordered</u>.

12