PLANNED PARENTHOOD OF WISCONSIN, Gary T. Prohska, M.D., Fredrik F. Broekhuizen, M.D., Gavin Jacobson, M.D., Neville Sender, M.D., Dennis D. Christensen, M.D. and Bernard Smith, M.D., on behalf of themselves and their patients seeking abortions, Plaintiffs,

v.

James E. DOYLE, in his official capacity as the Attorney General of the State of Wisconsin and Diane M. Nicks, in her official capacity as District Attorney for Dane County and as representative of a class of all District Attorneys in Wisconsin, Defendants.

No. 98–C–305–S.

United States District Court,
W.D. Wisconsin.

June 4, 1999.

MEMORANDUM and ORDER

SHABAZ, Chief Judge.

At issue in this matter is the constitutionality of 1997 Wisconsin Act 219, codified at Wis. Stat. §§ 895.038 and 940.16 (the "Act").

The Act forbids any person from intentionally performing a "partial-birth abortion." Wis. Stat. § 940.16(2). It defines "partial-birth abortion" as "an abortion in which a person partially vaginally delivers a living child, causes the death of the partially delivered child with the intent to kill the child, and then completes delivery of the child." Wis. Stat. § 940.16(1)(b). "Child" is defined as a "human being from the time of fertilization until it is completely delivered from a pregnant woman." Wis. Stat. § 940.16(1)(a) The Act provides an exception to its criminal sanction where a partial-birth abortion "is necessary to save the life of a woman whose life is endangered by a physical disorder, physical illness, or physical injury ... if no other medical procedure would suffice for that purpose." Wis. Stat. § 940.16(3). Violation of the Act is a class "All felony under Wisconsin law, subjecting violators to life imprisonment."

The Act also creates civil liability for its violation. It authorizes the father of the child aborted by the partial-birth abortion and, if the woman on whom the abortion was performed is a minor, either of her parents, to sue for damages. Wis. Stat. § 895.038(2)(a). Either may sue regardless of whether the woman consented to the partial-birth abortion. However, neither may sue if he or she consented to the partial-birth abortion. Wis. Stat. § 895.038.

In its enactment the Wisconsin legislature rejected proposed amendments, Exhibits 1—15.

**Procedural History**

Plaintiffs previously sought a preliminary injunction against enforcement of the Act which this Court denied. *Planned Parenthood v. Doyle,* 9 F.Supp.2d 1033 (W.D.Wis.1998). On the basis of undisputed facts, the Court found that (1) the Act could be narrowly construed to apply only to the dilation and extraction ("D & X") method of abortion, (2) the scienter requirements in the law helped save it from a vagueness challenge, and (3) the Act did not place an undue burden on a woman's right to choose an abortion. Accordingly, the Court found that plaintiffs had failed to establish a likelihood of success on the merits.

The Court of Appeals disagreed. *Planned Parenthood v. Doyle*, 162 F.3d 463 (7th Cir.1998). It found that plaintiffs might succeed in proving the Act unconstitutional for any of three reasons. First, the Act makes no exception for cases in which the fetus is not yet viable at the time of the abortion. *Id.* at 466. Second, the Act contains no exception for cases in which a D & X procedure is necessary for the preservation of the mother's health. *Id.* at 467. Third, the Act is vague. *Id.* at 469.

The Court of Appeals specifically noted that its opinion was based on the record compiled at the time and that "the full trial may cast the facts in a different light." *Id.* at 466. Accordingly, a trial was held in this matter to determine whether the evidence presented by the parties would continue to justify the Court of Appeals' concerns regarding the constitutionality of the Act.

### Findings of Fact

Based on the evidence presented at trial and those facts to which the parties have stipulated, the Court makes the following findings of fact. These findings may be divided into three parts according to the issue they primarily address. In the first group is evidence relating to the vagueness of the Act—whether the Act can be construed to apply to any procedure other than the D & X procedure. In the second group is evidence relating to the impact of the Act—whether its purpose or effect is to place an undue burden on a woman's right to an abortion. In the third group is evidence relating to the state interests served by the Act.

The Court will present its factual findings according to this division of the relevant evidence. The facts to which the parties have stipulated are accepted as true except to the extent they conflict with the following findings.

**Vagueness**—The following facts are relevant to the issue of whether the Act is unconstitutionally vague.

The most commonly used methods of abortion are suction curettage, dilation and evacuation ("D & E") and induction. Some physicians also use the dilation and extraction ("D & X") method of abortion.

In a suction curettage procedure, the physician generally dilates the cervix, inserts a tube (cannula) through the vagina and the cervix into the uterus, and removes the embryo or fetus and other products of conception through the cannula while it is inside the vagina, cervix, and uterus.

Abortion by induction involves inducing preterm labor. The physician uses laminaria to dilate the cervix and introduces medications into the patient that will both continue the dilation and induce labor. As a result of the labor, the fetus is expelled from the woman's uterus.

In a D & E procedure, the physician generally dilates the cervix by inserting laminaria. When sufficient dilation is achieved, the physician removes the laminaria and ruptures the amniotic sac. Depending on the gestational age and the size of the fetus and the amount of dilation achieved, the physician may use suction to remove the parts of the fetus and products of conception that are removable by suction. The physician will then insert forceps into the woman's uterus in order to grasp and remove the remaining parts of the fetus from the uterus through the cervix into the vagina and then from the woman's body. This process involves dismemberment of the fetus and repeated insertions of the forceps into the woman's uterus to grasp and remove remaining fetal parts. During an abortion performed in this manner, there often is fetal cardiac activity and other signs of life after a fetal part has been delivered into the vagina while the remainder of the fetus is in utero.

Plaintiffs Christensen and Smith define the D & X procedure as follows:

In the intact D & E procedure (which is also known as "dilation and extraction,"

"D & X" or "intact D & X"); the physician dilates the cervix and then removes the fetus from the uterus through the vaginal canal intact. The physician extracts the fetal body intact, usually feet first, until the cervix is obstructed by the after coming head, which is too large to pass through the cervix. Then the physician creates a small opening at the base of the skull and evacuates the contents, allowing the calvarium to pass through the cervical opening. The intentional removal of the fetus intact is what distinguishes an intact D & E procedure from a D & E procedure.

Similarly, the American College of Obstetricians and Gynecologists ("ACOG") defines the D & X procedure to include the following steps:

1. deliberate dilation of the cervix, usually over a sequence of days;

2. instrumental conversion of the fetus to a footling breech;

3. breech extraction of the body excepting the head; and

4. partial evacuation of the intracranial contents of a living fetus to effect vaginal delivery of a dead but otherwise intact fetus.

Dr. Broekhuizen agrees with this definition but would define D & X more broadly to include other variations on the technique, including crushing the skull to allow it to pass through the cervix. Haskell agrees that how the skull is reduced in size is not an important distinction. He stated that "the medical distinction between a D & E and a D & X is the extent to which the surgeon attempts to extract portions of the fetus intact." Ex. 227 at 8.

Haskell also testified that in perhaps 75% of the D & X procedures he performs, he cuts the umbilical cord before removing the fetus from the uterus. However, sometimes the child is partially delivered before he cuts the umbilical cord. Haskell stated that the child is likely to die within minutes after Haskell cuts its cord.

As evidenced by the policy statements of the American Medical Association (Ex. 17) and the American College of Obstetricians and Gynecologists (Ex. 16) as well as articles published in prominent medical journals (Exs. 205, 206, 207 and 240), the medical community understands the phrase "partial birth abortion" to refer to the dilation and extraction or "D & X" procedure. *See also* Ex. 239 at 35 ("The breech extraction variation of intact D & E, described in the lay press as 'partial birth abortion' has been made illegal in several states.") Nevertheless, the plaintiff physicians state that they find the definition of partial birth abortion in the Act to be vague because the definition could be construed to cover the three most common methods of abortion including suction curettage, induction, and dilation and evacuation ("D & E"). *See Plaintiffs' Proposed Finding of Fact No. 24.* They expressed concern over the following situations: 7

**Suction Curettage**—Occasionally, in some suction curettage procedures, it is necessary for the physician to use forceps to remove the fetus from the uterus. Sometimes the physician removes the fetus in parts and other times it is intact. When the fetus is intact, there may be a point in the procedure when part of the fetus is outside of the uterus while the rest of the fetus remains in the uterus.

**Induction**—Sometimes during an induction the physician must assist in the removal of the fetus; and sometimes the physician collapses or compresses the skull or some part of the fetal abdomen to allow it to pass through the cervix.

**D & E**—In some D & E procedures, a physician draws part of the intact fetus partially through the cervix and into the vaginal canal. After the grasped part has come through the cervix the physician disjoins the part from the rest of the fetus, which remains in the uterus. Physicians who perform abortions know that disarticulating a fetal limb from a

pre-viable fetus will cause the fetus to die within a few minutes.

Trial testimony and the stipulated facts establish that physicians cannot control when a child's death occurs in either the suction curettage or induction methods of abortion. While death of the pre-viable fetus is the ultimate outcome of these procedures, there is no particular step taken in either of these procedures that is practically certain to kill the fetus at an identifiable point in time. Fetal demise occurs at different times and from different causes.

Similarly, when beginning a D & E abortion, a physician cannot predict when the child will die and generally it is not known when a child does die. If the child is alive when dismemberment begins, the physician may be practically certain that dismembering substantial portions of the child will kill the child before delivery of all parts of the fetus is completed. In those circumstances, however, the physician does not complete delivery of a "child." Rather, the physician delivers dismembered body parts.

By contrast, physicians who perform D & X abortions know that crushing the fetal skull or piercing the skull and suctioning the contents will cause the fetus to die immediately or within a few minutes. They take this step after partially vaginally delivering the child. Accordingly, they are practically certain to kill a child in the birth canal on most occasions. Except for beginning the abortion with an injection that is lethal to the fetus, the piercing or crushing of the skull in a D & X procedure and cutting the umbilical cord, a physician does not intentionally kill the child at any specific point during the procedure.

Accordingly, based on this evidence, the Court concludes that only in the D & X procedure is the physician aware that his conduct is practically certain to kill a living child in the birth canal before completing delivery of the child.

**Undue Burden**—In addition to the facts already stated, the following facts are relevant to whether the Act imposes an undue burden on a woman's right to choose an abortion.

There are both advantages and disadvantages of the D & X procedure as compared to the D & E procedure. One of the advantages of the D & X procedure is that it is quicker and easier to perform than the D & E procedure after 18 weeks lmp. The shorter procedure time reduces the amount of bleeding and reduces the amount of time that the patient has to be subject to anesthesia. Another advantage is that the physician in the D & X procedure does not have to make multiple insertions of the forceps into the uterus. Reducing the use of instruments in the uterus reduces the risk of uterine perforation.

The D & X also has certain disadvantages in that it creates risks not found in the D & E procedure. The D & X procedure requires greater dilation of the cervix through an additional 24 hours of laminaria. The testifying physicians agreed that delaying an abortion creates additional risks. With regard to the D & X procedure these risks include a risk that the woman's membranes might rupture or that she may develop an infection. The greater dilation used in D & X also poses the risk of cervical incompetence, which may lead to premature births in future pregnancies.

Also, the D & E procedure has a proven track record that the D & X procedure does not have. D & E is the most common method of second-trimester abortion, accounting for hundreds of abortions in Wisconsin each year. D & X, by contrast, is rarely used. Among the plaintiff physicians, only Christensen regularly performs the D & X procedure and he performs just 2–3 such procedures each year.

There are no published, medically-recognized studies comparing the risks of D & E to D & X. Haskell testified to an informal comparison. He stated that in 10 years of performing abortions he does not recall any complications in the D & X

procedures he has performed and recalls perhaps 2–3 complications in the D & E procedures he has performed. His experience conflicts with that of his mentor, Dr. McMahon, as reported in Exhibit 228. McMahon encountered major complications in 4 out of 1362 patients using the D & X procedure. This success rate was no better, than for D & E's. The Court places little reliance on any of this anecdotal evidence because there has been no suggestion that the women receiving D & E abortions were similarly situated to the women receiving D & X abortions, or that the complication rates experienced by Haskell and McMahon were statistically significant.

More telling evidence concerning the relative safety of the D & X procedure may be found in the opinions of the testifying physicians. None of the physicians would state unequivocally that the D & X procedure is safer than the D & E procedure. Broekhuizen conceded that further study of the procedures is required. Smith admitted that he had never encountered a situation where D & X would have been the best procedure to use. Haskell, who invented the procedure, admitted that the D & X procedure is never medically necessary to save the life or preserve the health of a woman. Giles agreed.

Major medical associations are equally reluctant to endorse the D & X procedure. ACOG reviewed the D & X procedure and "could identify *no* circumstances under which [the D & X procedure] would be the only option to save the life or preserve the health of the woman." Ex. 16 at 2. ACOG did state that there "may" be circumstances in which the D & X procedure is the best or most appropriate procedure, but it did not identify what those circumstances might be. *Id.*

Similarly, the American Medical Association concluded that "there does not appear to be any identified situation in which intact D & X is the only appropriate procedure to induce abortion, and ethical concerns have been raised about intact D & X.

The AMA recommends that the procedure not be used unless alternative procedures pose materially greater risk to the woman." Ex. 17 at 15. Again, however, the AMA did not identify any particular circumstances in which "alternative procedures pose materially greater risk to the woman." *Id.*

The plaintiff physicians' reluctance to endorse the safety of the D & X procedure is evidenced by their conduct. Actions often speak louder than words, and in this case plaintiffs' conduct indicates that the D & X procedure offers no material advantage in terms of safety. As noted, none of the plaintiff physicians routinely performs the D & X procedure. Nor do they train their staff or medical students to perform the procedure. They also do not routinely inform their patients as to the procedure's availability or its supposed advantages. All of the physicians use the same consent form regardless of the method of abortion used.

The conduct of the other physician witnesses offered by plaintiffs suggests the same conclusion. Haskell invented the D & X procedure and has demonstrated an unusual fondness for it. Nevertheless, he sometimes chooses to perform a D & E abortion -despite his alleged concerns regarding its safety—because the additional delay involved in a D & X procedure would be inconvenient for the woman. Similarly, Stubblefield and his colleagues perform induction abortions at 17—20 weeks lmp and do not offer D & X abortions because the added time necessary to dilate the cervix is not worth the benefits of the D & X procedure.

Similarly, plaintiffs' conduct during the two weeks that the Act was in effect provides further evidence concerning the alleged burdens imposed by the Act. Broekhizen conceded that during this period he continued to perform abortions without altering his procedures. Smith effectively conceded the same when he declined to answer a question on this point and in-

voked his Fifth Amendment rights against self-incrimination. Christensen also continued to perform abortions during this period. He issued a press release stating that he could comply with the Act as he interpreted it only by altering his procedures in a way that would impose greater health risks on women. Nevertheless, Christensen's rate of complications from abortions did not go up in a "statistically significant fashion" while Wis. Stat. § 940.16 was in effect.

Regardless of the general safety of the D & X procedure, plaintiffs argue the procedure is safer in certain circumstances. They contend that in some induction procedures the fetal skull is too large to pass through the cervix and must be crushed in order to complete delivery. Several of the plaintiff physicians admitted that they could wait for the skull to pass the cervix naturally, but they stated that there would be no medical reason for doing so and the delay may lead to excessive bleeding.

Plaintiffs also contend there are certain maternal conditions or fetal anomalies in which the D & X procedure is the best procedure to use in order to accomplish an abortion. In support of this position they offered the testimony of Dr. Broekhuizen who described three circumstances in which he intended to perform D & X abortions. In the first case, Broekhuizen aborted a pregnancy in a woman with schleroderma. He dilated the cervix through serial application of laminaria and the fetus was completely expelled intact. He did not crush the skull or puncture the skull and suction out the contents.

In the second case, Broekhuizen intended to perform a D & X abortion to terminate the pregnancy of a woman with skeletal dysplasia. He chose the D & X procedure because the woman opposed dismemberment of the fetus through the D & E procedure and had an "inordinate" fear of labor pains so that she did not want an induction. Broekhuizen also wanted to deliver an intact fetus in order to obtain a more definite diagnosis of dys-

plasia. Despite Broekhuizen's intent to perform a D & X abortion, serial dilation of the cervix led to a spontaneous onset of labor and an intact fetus was delivered.

In the third case, Broekhuizen performed the D & X procedure to abort a fetus 28 weeks lmp with hydrocephalus. Due to this fetal anomaly the head was larger than that of a child carried to term. Broekhuizen performed a combination of dilation and induction, and then decompressed the head with scissors and needles and completed delivery.

Dr. Giles disagreed that the D & X procedure was the best procedure to use in any of these circumstances. Indeed, with 25 years of experience in high risk pregnancies, Giles has never seen a situation where D & X would be the best procedure to use. He deemed induction the safest method in all late-term (20 or more weeks lmp) pregnancies because it does not require instrumentation in the uterus. Accordingly, in his view, induction is safer even than D & E. Moreover, like D & X, the induction procedure yields an intact fetus which could be studied by physicians and grieved over by mothers.

Giles disputed the need to crush the fetal skull in induction procedures. He routinely uses cervical relaxants and other drugs to allow the fetal head to pass quickly without complications. He also noted that a physician could assist an induction procedure by gently compressing the fetal head without either the intent to kill the fetus or the practical certainty that death of the fetus would be the result.

Giles also stated that D & X is not the best method of abortion where a child has hydrocephalus. He stated that a needle could be inserted through the mother's abdomen to safely reduce the size of the child's head in order to allow the physician to perform an abortion through induction.

The Court finds Giles' testimony more credible. Giles spoke from substantial experience in high risk pregnancies, having performed over 1,000 abortions through

induction without any major complications. His view that induction could be used in the situations Broekhuizen described is supported by Broekhuizen's experience. Although Broekhuizen intended to perform the D & X procedure in the first two circumstances he described, he did not actually perform the procedure. In each case the pregnancy was aborted through what was essentially an induction procedure.

Moreover, Giles expressed his opinion that the D & X procedure is never necessary to save the live or preserve the health of a woman despite the fact that Giles regularly provides abortions and otherwise supports a woman's right to an elective abortion. Giles' willingness to state what must be an unpopular view in the circles in which he travels bolsters his credibility.

Haskell and Broekhuizen criticized Giles' use of cervical relaxants and other drugs, but there was no showing that these doctors had the expertise or experience to offer this criticism. Moreover, Giles' substantial success in performing abortions through inductions is more credible evidence than the unsupported opinions of these physicians.

In light of this substantial evidence, the Court concludes that partial birth abortion is never medically necessary to preserve the health or life of a woman and abolition of the procedure does not subject women to materially greater health risks. D & E is nearly always an option and there has been no credible showing that D & E is riskier that D & X. Moreover, induction is safer than even D & E and can be used in those rare pregnancies, if any, where D & E would be problematic.

Moreover, having reviewed the proposed amendments to the Act as well as the amicus brief filed by state legislators, the Court finds that the Legislature did not adopt the Act for the purpose of placing an obstacle in the path of women seeking an abortion. As the Court has previously stated, the proposed amendments were reasonably rejected to avoid creating loop-holes in the law that would have allowed physicians to easily avoid the restrictions the law imposes. *Planned Parenthood v. Doyle*, 9 F.Supp.2d at 1042.

**The State Interest Served by the Act**— In addition to the facts already stated, the following facts are relevant to whether the Act serves a compelling state interest.

As Giles testified, partial birth abortion raises several concerns including pain to the child, denying the child any possibility of survival, and risks to maternal health. These concerns have been noted by the AMA and have been discussed in prominent medical journals. *See* Exs. 17, 205, 206, 207 and 240. In an article in the Journal of the American Medical Association, Drs. Sprang and Neerhof concluded that "intact D & X partial-birth abortion should not be performed because it is needlessly risky, inhumane and ethically unacceptable." Ex. 206 at 746. They observed that when the physician kills a child in a partial birth abortion, the child "is merely inches from being delivered and obtaining full legal rights of personhood under the U.S. Constitution." *Id.* at 746. Accordingly, the doctors concluded that partial birth abortion is "closer to infanticide than it is to abortion." *Id.* The legislators who filed an amicus brief make similar arguments.

The Court concludes that these facts demonstrate that the Act serves compelling state interests.

### Conclusions of Law

The Court now turns to its conclusions of law with a view toward determining whether the Court of Appeals' concerns regarding the constitutionality of the Act remain valid.

In undertaking this task, the Court must begin its review of the Act with the strong presumption that it is constitutional. *State v. Cissell,* 127 Wis.2d 205, 378 N.W.2d 691 (1985); *Andree v. Ashland County,* 818 F.2d 1306, 1313 (7th Cir.1987). Plaintiffs bear the burden of

showing that the Act is unconstitutional beyond a reasonable doubt. *Wisconsin v. Carpenter,* 197 Wis.2d 252, 541 N.W.2d 105, 109 (1995). In assessing whether a party has carried its burden of proof, "[e]very presumption must be indulged to sustain the law if at all possible and, wherever doubt exists as to a legislative enactment's constitutionality, it must be resolved in favor of constitutionality." *Id.* In light of these considerations and the evidence presented, the Court finds that the Act is constitutional. The fully developed record demonstrates that the Court of Appeals' concerns have not been borne out by the evidence.

■ First, the evidence establishes that the Act need not make an exception for cases in which the fetus is not yet viable at the time of the abortion. *Planned Parenthood v. Casey,* 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), plainly establishes that states may regulate abortions pre-viability. They may do so in order to "further the interest in potential life *or some other valid state interest*" so long as their regulation does not place a substantial obstacle in the path of a woman seeking an abortion. *Casey,* 505 U.S. at 877, 112 S.Ct. 2791 (emphasis added). Accordingly, the Act is not unconstitutional *per se* merely because it does not make an exception pre-viability. Rather, the Court of Appeals found the Act unconstitutional based on its finding that the Act did not serve the state's interest in maternal health or potential life or any other compelling state interest. *See Planned Parenthood v. Doyle,* 162 F.3d at 466–67.

As noted, the fully developed record establishes that the Act serves several compelling state interests, including interests in maternal health, potential life and morality.

**Maternal Health**—The Act serves Wisconsin's interest in maternal health insofar as use of the D & X procedure places women at higher risk of infection, rupture of the amniotic sac, and cervical incompetence. Wisconsin could rationally pro-

hibit use of what is clearly an unnecessary procedure in order to protect women from these dangers.

**Potential Life**—The Act also serves Wisconsin's interest in potential life insofar as use of the D & X procedure creates risks for subsequent pregnancies due to cervical incompetence.

■ **Morality**—It has long been recognized that states have a legitimate interest in prohibiting conduct deemed immoral. *See Bowers v. Hardwick,* 478 U.S. 186, 196, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986) (upholding constitutionality of Georgia's sodomy law in part because it was rationally related to "the presumed belief of a majority of the electorate in Georgia that homosexual sodomy is immoral and unacceptable"). Although abortion laws are typically justified according to the state's interest in maternal health or potential life, the *Casey* court specifically recognized that "other valid state interest[s]" could justify a pre-viability abortion restriction. *Casey,* 505 U.S. at 877, 112 S.Ct. 2791.

As the Court of Appeals observed, the Act is not likely to save the life of any child because other safe alternative methods of abortion are available. *Planned Parenthood v. Doyle,* 162 F.3d at 470. Nevertheless, even if the state's interest in a child pre-viability is not sufficient to allow the state to protect it from destruction, in the D & X procedure the child is just inches from being born. Surely at that point the state has a sufficient interest in the child to allow the state to regulate the manner of the child's death, regardless of whether the State is able to keep the child alive. Wisconsin has declared that such children are not to endure—and Wisconsin physicians are not to inflict—the gruesome death imposed in the D & X procedure. It is well-within the province of the state to legislate against the immorality of partial birth abortion.

Perhaps, as plaintiffs argue, the child will endure a gruesome death through some other method of abortion. This does

not detract from the legitimacy of Wisconsin's partial birth abortion law, however, because it is apparently beyond Wisconsin's power to eliminate those other methods of abortion. Wisconsin can eliminate this one method. Given the national groundswell of opposition to partial birth abortion and the ethical concerns raised within the medical community concerning the procedure, the State cannot be faulted for acting where it can to outlaw an unnecessary procedure that in most cases in which it is used is literally inches away from being infanticide.

Any and all of these state interests justify Wisconsin's partial birth abortion law so that the Act need not make an exception for cases in which the fetus is not yet viable at the time of the abortion.

■■ Second, the Act need not contain an exception for cases in which a D & X procedure is necessary for the preservation of the mother's health. As noted, a pre-viability restriction on the right to an abortion is unconstitutional if it places an undue burden on a woman's right to choose an abortion. *Casey*, 505 U.S. at 877, 112 S.Ct. 2791. As the Court of Appeals found, a law which prohibits women from obtaining an abortion through a method that is necessary for the preservation of the mother's health places an undue burden on the woman's right to an abortion. *Planned Parenthood v. Doyle*, 162 F.3d at 468.

But as the fully developed record reveals, Wisconsin's partial birth abortion law is not such a law. Partial birth abortion is never medically necessary to preserve the health or save the life of a woman and abolition of the procedure does not subject women to materially greater health risks. Accordingly, the trial has "cast the facts in a different light." While the Court of Appeals assumed that the D & X procedure would be the best medical procedure for obtaining an abortion in at least some circumstances, the evidence demonstrates that it is not. Because the Act leaves women with safe, alternative methods of abortion, it does not impose an undue burden on their abortion rights.

■ Third, the Act is not vague. The Court remains convinced that plaintiffs' alleged confusion concerning the meaning of the Act is a demon of their own creation. Everyone understands what partial birth abortion is and what it is not. It *is* the D & X procedure. It is not the suction curettage procedure, the induction procedure or the D & E procedure. Defendants have stipulated to this reading of the law, which supports the Court's interpretation. *See Wolman v. Walter*, 433 U.S. 229, 238, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977) (Blackmun, J.) (relying in part on the defendants' stipulation as to the meaning of a law in rejecting the plaintiffs' assertion that the statute at issue was "so vague as to fail to insure against sectarian abuse.")

In rejecting plaintiffs' motion for a preliminary injunction, this Court found that *only* in the D & X method of abortion does a physician act with the purpose of performing a procedure in the steps described by the statute—*first* partially vaginally delivering a living child and then causing the death of the partially delivered child with the intent to kill the child and then completing delivery of the child. *Planned Parenthood v. Doyle*, 9 F.Supp.2d at 1041–44. The Court of Appeals did not take issue with this conclusion. Nevertheless, it observed that the Act "must be read in light of the definition of intentionally' elsewhere in Wisconsin criminal-law statutes as either acting purposely to accomplish the forbidden end or being aware that [one's] conduct is practically certain to cause that result.'" *Planned Parenthood v. Doyle*, 162 F.3d at 469, citing Wis. Stat. § 939.23(3). The Court of Appeals observed that in some methods of abortion other than D & X a physician might be aware that he or she is "practically certain" to kill an intact living child in the birth canal before delivery is completed. Plaintiffs took the same position at trial.

*See* Plaintiffs' Proposed Finding of Fact No. 24.

The fully developed record has not justified this concern. As noted, physicians cannot control when death occurs in induction and suction curettage abortions and cannot be "practically certain" that any step they take will kill a fetus in the birth canal. Accordingly, even if their conduct in performing these abortions is construed as partially delivering a living child, they do not thereafter take any second step for the purpose of killing the child or that is practically certain to kill the child before completing delivery. Moreover, a physician who sets out to perform an abortion through suction curettage or induction does not purposely perform the three steps proscribed by the act in the order proscribed, nor is he or she practically certain to do so.

The D & E procedure also is not covered by the Act. The physician in the D & E procedure removes the fetus in parts. As this Court has already held, the Act refers to delivery of a "child" which cannot be equated to delivery of "dismembered body parts." *Planned Parenthood v. Doyle,* 9 F.Supp.2d at 1041. Accordingly, the *legal* interpretation of the Act excludes delivery of a dismembered fetus, regardless of the *lay* interpretation which the testifying physicians—including Giles, defendants' expert—sought to impose upon the Act. The Act does not apply to the D & E procedure.

For similar reasons, the Act does apply to the D & X procedure. The D & X procedure is distinct from the D & E procedure in that the goal of the D & X is to extract an *intact fetus*—a "child"—rather than a dismembered fetus. Haskell, Christensen and Smith agreed with this distinction. Moreover, the D & X procedure is the only procedure in which the physician purposely follows the sequence of steps proscribed by the Act. Accordingly, D & X is the only abortion procedure abolished by the Act.

Plaintiffs also complain that there is disagreement concerning what a D & X is, thereby making the law vague. But the evidence demonstrated substantial agreement concerning the meaning of D & X. All of the medical authorities offer substantially the same definition of D & X. To the extent they disagree in any relevant way, it is a disagreement concerning how physicians kill the child—whether through suctioning the cranial contents, crushing the skull or cutting the umbilical cord. But there is no disagreement that if a physician takes one of these steps after partially vaginally delivering a living child and then completes delivery of the child, he or she has performed a partial birth abortion. Accordingly, the law gives physicians reasonable notice of the conduct proscribed.

As noted, the Act is constitutional if it prohibits only the D & X procedure. In reviewing the language of the Act, it is difficult to discern how the Legislature could have signaled any more clearly its intent to adopt this limited prohibition—without creating enormous loopholes in the law. The Act specifically uses the term "partial birth abortion" which physicians understand to mean D & X abortions. Moreover, the steps it describes as constituting a "partial birth abortion" apply most naturally and easily to the D & X procedure. Dr. Broekhuizen conceded that it is only by bending the language of the Act beyond its most obvious meaning that it can be construed to apply to the suction curettage method of abortion. The same is true with regard to all other methods of abortion except D & X. The contortions the plaintiffs invite this Court to impose on the law run contrary to the command that every presumption in favor of constitutionality be indulged. Accordingly, the Court concludes that the law is not vague.

**Consent**

 One issue remains that was not addressed by the Court of Appeals. Plaintiffs argue that the civil liability provisions

in the Act amount to an unconstitutional tacit consent requirement. However, as this Court held in response to plaintiffs' motion for a preliminary injunction, if the law criminalizing partial-birth abortions is constitutionally sound, then a law imposing civil sanctions for the same activity must withstand a constitutional challenge as well. *See United States v. Masters*, 924 F.2d 1362, 1367 (7th Cir.1991) Having found the criminal sanctions in the Act constitutional, the Court finds the civil sanctions constitutional as well.

### ORDER

IT IS ORDERED that judgment be entered in favor of defendants against plaintiffs dismissing their complaint and all claims contained therein with prejudice and costs except as to Section 895.038(3)(b) of the Act which is severed and declared unconstitutional.

IT IS FURTHER ORDERED that enforcement of the judgment is stayed pending appeal.