# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 98-3245NE, 98-3300NE

_____

| | |
|---|---|
| _____ | * |
| | * |
| No. 98-3245NE | * |
| _____ | * |
| | * |
| Leroy H. Carhart, on behalf of himself and his patients obtaining abortions, | * |
| | * |
| | * |
| Appellee, | * |
| | * |
| v. | * |
| | * |
| | * |
| Donald Stenberg, in his official capacity as Attorney General for the State of Nebraska, | * |
| | * On Appeal from the United |
| | * States District Court |
| | * for the District of |
| Appellants, | * Nebraska. |
| | * |
| Mike Munch, in his official capacity as County Attorney for Sarpy County, and as a representative of all County Attorneys in Nebraska, | * |
| | * |
| | * |
| | * |
| | * |
| Defendant, | * |
| | * |
| Gina Dunning, in her official capacity as Director of Regulation and Licensure of the Nebraska Department of Health and Human Services, and Charles Andrews, M.D., in his official capacity | * |
| | * |
| | * |
| | * |
| | * |

as Chief Medical Officer of Nebraska,  *
                                        *
            Appellants,                 *
                                        *
       ----------------------           *
                                        *
State of South Carolina; State of Idaho;  *
State of Louisiana; State of Ohio; State  *
of Pennsylvania; State of Rhode Island;   *
State of South Dakota; and              *
State of Utah,                          *
                                        *
          Amici Curiae,                 *
                                        *
Family Research Council,                *
                                        *
          Amicus Curiae.                *
                                        *  On Appeal from the United
       _____                    *  States District Court
                                        *  for the District of
       No. 98-3300NE                    *  Nebraska.
       _____                    *
                                        *
Leroy H. Carhart, on behalf of himself  *
and his patients obtaining abortions,   *
                                        *
          Appellee,                     *
                                        *
       v.                               *
                                        *
                                        *
Donald Stenberg, in his official        *
capacity as Attorney General for        *
the State of Nebraska,                  *
                                        *
          Appellee,                     *
                                        *

Mike Munch, in his official capacity             *
as County Attorney for Sarpy County,            *
and as a representative of all County           *
Attorneys in Nebraska,                          *
                                                *
        Appellant,                              *
                                                *
Gina Dunning, in her official capacity          *
as Director of Regulation and Licensure         *
of the Nebraska Department of Health            *
and Human Services; and Charles                 *
Andrews, M.D., in his official capacity         *
as Chief Medical Officer of Nebraska,           *
                                                *
        Appellees,                              *
                                                *
     ----------------------                          *
                                                *
State of South Carolina; State of Idaho;        *
State of Louisiana; State of Ohio; State        *
of Pennsylvania; State of Rhode Island;         *
State of South Dakota; and                      *
State of Utah,                                  *
                                                *
        Amici Curiae,                           *
                                                *
Family Research Council,                        *
                                                *
        Amicus Curiae.                          *

_____

Submitted:  April 19, 1999

Filed:  September 24, 1999

_____

-3-

Before RICHARD S. ARNOLD and WOLLMAN,[1] Circuit Judges, and
    MAGNUSON,[2] District Judge.
_____

RICHARD S. ARNOLD, Circuit Judge.


The State of Nebraska appeals a District Court[3] decision holding a Nebraska statute banning "partial-birth abortion" unconstitutional. The District Court permanently enjoined enforcement of the statute and awarded attorney's fees and costs to the plaintiff. The County Attorney, named in the lawsuit in his official capacity and as a representative of all county attorneys, appeals the portion of the judgment awarding attorney's fees against him. For the following reasons, we affirm the judgment of the District Court.

It is important to have in mind that we deal here with a particular legal question: the validity, under the Constitution of the United States, of a certain Nebraska law. The law refers to "partial-birth abortion," but this term, though widely used by lawmakers and in the popular press, has no fixed medical or legal content. The closest thing we have to a medical definition comes from the American College of Obstetricians and Gynecologists (ACOG). The ACOG definition describes a method of abortion (commonly called dilation and extraction, or D&X) involving extraction, from the uterus and into the vagina, of all of the body of a fetus except the head, following which the fetus is killed by extracting the contents of the skull. Thereafter,

_____

[1]The Hon. Roger L. Wollman became Chief Judge of this Court on April 24, 1999.

[2]The Hon. Paul A. Magnuson, Chief Judge, United States District Court for the District of Minnesota, sitting by designation.

[3]The Hon. Richard G. Kopf, United States District Judge for the District of Nebraska.

-4-

the dead but otherwise intact fetus is taken from the mother's body. Certainly this medical description is within the definition of "partial-birth abortion" contained in the Nebraska statute before us. The difficulty is that the statute covers a great deal more. It would also prohibit, in many circumstances, the most common method of second-trimester abortion, called a dilation and evacuation (D&E). Under the controlling precedents laid down by the Supreme Court, such a prohibition places an undue burden on the right of women to choose whether to have an abortion. It is therefore our duty to declare the statute invalid.

I.

On June 9, 1997, Nebraska's Governor signed into law Legislative Bill 23, a bill enacted by the Nebraska Legislature prohibiting "partial-birth abortion." The statute provides:

> No partial-birth abortion shall be performed in this state, unless such procedure is necessary to save the life of the mother whose life is endangered by a physical disorder, physical illness, or physical injury, including a life-endangering physical condition caused by or arising from the pregnancy itself.

Neb. Rev. Stat. § 28-328(1) (1998). "Partial-birth abortion" is defined in the statute as:

> an abortion procedure in which the person performing the abortion partially delivers vaginally a living unborn child before killing the unborn child and completing the delivery. For purposes of this subdivision, the term partially delivers vaginally a living unborn child before killing the unborn child means deliberately and intentionally delivering into the vagina a living unborn child, or a substantial portion thereof, for the purpose of performing a procedure that the person performing such procedure knows will kill the unborn child and does kill the unborn child.

Id. § 28-326(9). The intentional and knowing performance of an unlawful "partial-birth abortion" is a Class III felony. See id. § 28-328(2). A physician who intentionally and knowingly performs an unlawful "partial-birth abortion" will automatically have his license to practice medicine in Nebraska suspended and revoked. See id. § 28-328(4).

Shortly after the passage of LB 23, Dr. LeRoy Carhart filed a complaint challenging the constitutionality of the statute. In response to the complaint, the District Court granted a temporary restraining order, followed by a preliminary injunction, suspending enforcement of the statute. After a trial on the merits, the District Court issued its final judgment, holding LB 23 unconstitutional, and permanently enjoining enforcement of LB 23 against Dr. Carhart, his patients, and other similarly situated individuals.

Dr. Carhart challenged the constitutionality of LB 23 on two separate grounds. He argued that LB 23 imposed an undue burden on himself and his patients in two ways. First, because the D&X procedure is the safest procedure for some women in certain circumstances, banning that procedure places an undue burden on women seeking an abortion. Second, because LB 23 prohibits vaginally delivering a "substantial portion" of a fetus as part of an abortion procedure, the law bans the dilation and evacuation (D&E) procedure as well. Because the D&E procedure is the most widely used second-trimester abortion procedure, this ban also places an undue burden on women seeking to have an abortion. Dr. Carhart also challenged the law as being vague, arguing that it was unclear what "substantial portion" meant. The District Court agreed, holding both that the law created an undue burden for Dr. Carhart and his patients, and that the law was void for vagueness. Carhart v. Stenberg, 11 F. Supp. 2d 1099 (D. Neb. 1998).[4]

---

[4]Because we are holding the law unconstitutional on undue-burden grounds, it is not necessary for us to discuss the vagueness issue. Nor is it necessary for us to

-6-

II.

We state the facts as found by the District Court. (The Court's findings are not clearly erroneous, and we therefore must accept them.) Dr. Carhart operates a family medical practice with a specialized abortion facility in Bellevue, Nebraska. He is licensed to practice medicine in Nebraska, as well as in seven other states. Dr. Carhart performs abortions in a clinic setting from a gestational age of three weeks[5] until fetal viability. The abortion procedures Dr. Carhart performs vary depending on the gestational age of the fetus as well as on various other medical factors. As we shall explain, two of the procedures Dr. Carhart performs are directly affected by LB 23's ban: dilation and evacuation (D&E) and intact dilation and evacuation or dilation and extraction (D&X).[6] Both are procedures for second-trimester abortions. LB 23 affects not only Dr. Carhart, but any doctor in Nebraska who performs the D&E or the D&X procedure, as well as that doctor's patients.

The most common method of abortion during the second trimester is the D&E procedure. A physician performing a D&E procedure gradually dilates the cervix and then removes the fetus and other products of conception. A report by the American

---

discuss whether the law creates an undue burden by prohibiting the D&X procedure. The basis for our holding is the undue burden created by the ban of the D&E procedure.

[5]Gestational age is measured from the first day of the woman's last menstrual period.

[6]The District Court's very thorough opinion details other abortion procedures as well. We see no need to repeat these descriptions and will therefore focus only on the procedures affected by LB 23.

Medical Association[7] describes the D&E procedure used from thirteen to fifteen weeks' gestation as follows:

> Osmotic dilators are usually used. Intravenous fluids and an analgesic or sedative may be administered. A local anesthetic such as a paracervical block may be administered, dilating agents, if used, are removed, and instruments are inserted through the cervix into the uterus to remove fetal and placental tissue. Because fetal tissue is friable and easily broken, the fetus may not be removed intact. The walls of the uterus are scraped with a curette to ensure that no tissue remains. In pregnancies beyond 14 weeks, oxytocin is given intravenously to stimulate the uterus to contract and shrink.

Ex. 7, at 8 (footnotes omitted). The AMA report also includes a description of a D&E procedure used from sixteen to twenty-four weeks' gestation. It includes some variations from the procedure used from thirteen to fifteen weeks. After the cervix has been dilated:

> Fetal tissue is extracted through the use of surgical instruments, followed by extraction of placental tissue and subsequent curettage. Because the fetus is larger at this stage of gestation (particularly the head), and because bones are more rigid, dismemberment or other destructive procedures are more likely to be required than at earlier gestational ages to remove fetal and placental tissue. Some physicians use intrafetal potassium chloride or digoxin to induce fetal demise prior to a late D&E (after 20 weeks), to facilitate evacuation.

---

[7]The parties stipulated to the admission of the American Medical Association's "Report of the Board of Trustees on Late-Term Abortion" at the preliminary injunction hearing. The report, which studied late-term abortion techniques, was admitted as Exhibit 7.

<u>Id</u>.

When dismemberment occurs during a D&E procedure, it does not occur in utero. Prelim. Inj. Tr. 116; Trial Tr. 30-31. Dr. Carhart explained that during the D&E procedure, the dismemberment occurs after a part of the fetus has been pulled through the cervix, into the vagina:

> Dr. Carhart:   The dismemberment occurs between the traction of . . . my instrument and the counter-traction of the internal os of the cervix. . . .
>
> Counsel:      So the dismemberment occurs after you pulled a part of the fetus through the cervix, is that correct?
>
> A:      Exactly.  Because you're using – The cervix has two strictures or two rings, the internal os and the external os, and you have – that's what's actually doing the dismembering. . . .
>
> Q:      When we talked before or talked before about a D&E, that is not – where there is not intention to do it intact, do you, in that situation, dismember the fetus in utero first, then remove portions?
>
> A:      I don't think so . . . I don't know of any way that one could go in and intentionally dismember the fetus in the uterus.  If you grab an extremity and twist it, you can watch the whole fetus just twist.  It takes something that restricts the motion of the fetus against what you're doing before you're going to get dismemberment.

Prelim. Inj. Tr. 116-17.  Dr. Phillip Stubblefield, a witness for the plaintiff, testified that to dismember the fetus in utero a physician:

> would have to introduce into the uterus something that would cut up the fetus, or else put in two forceps and try to dismember the fetus inside the uterus,

which would increase considerably your chance that you're going to tear the uterus, perforate the uterus, seriously injure the woman. That is not done.

Trial Tr. 31.

In some circumstances, a physician performing a D&E procedure may attempt to remove the fetus intact. This procedure, known as an intact dilation and evacuation (intact D&E) or a dilation and extraction (D&X) can be used in abortions performed from sixteen to twenty-four weeks' gestation. The AMA report describes the D&X procedure as:

> deliberate dilatation of the cervix, usually over a sequence of days; instrumental conversion of the fetus to a footling breech; breech extraction of the body excepting the head; and partial evacuation of the intracranial contents of a living fetus to effect vaginal delivery of a dead but otherwise intact fetus.

Ex. 7, at 8 (footnotes omitted). The physician generally brings all of the fetus, except for the head, out of the uterus into the vagina. Trial Tr. 35-36; J.A. 1150. Because the cervix is not dilated enough to allow the head to pass through, the physician inserts an instrument into the fetal skull and evacuates the contents, collapsing the skull and allowing removal of an intact fetus. Trial Tr. 35-36, 716; J.A. 1150.

Fetal death[8] does not always occur at the same stage of each D&E or D&X procedure. Prelim. Inj. Tr. 217-18. In both procedures, the physician brings a part of a living fetus out of the uterus into the vagina.[9] In a D&E procedure, fetal demise will occur after dismemberment. The time it takes for fetal demise to occur can, however, vary. Id. at 118-19. During a D&X procedure, fetal demise will occur some time after the physician has evacuated the cranial contents. In either procedure, fetal demise will generally occur within a matter of minutes, and after part of the fetus has been brought out of the uterus into the vagina. Id. at 112-13, 118-19.

### III.

The Supreme Court has held that a woman has a constitutional right to choose whether to terminate a pregnancy. Roe v. Wade, 410 U.S. 113, 153 (1973). Although a state cannot prohibit a woman from choosing to have an abortion, the state can promote the interest in potential human life and, after fetal viability,[10] "regulate, and even proscribe, abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." Roe, 410 U.S. at 164-65. A

---

[8]With the use of ultrasound, a physician can detect a fetal heartbeat to determine that a fetus is living. Trial Tr. 22-23. No agreed upon definition exists, however, as to what constitutes fetal demise. Id. Physicians determine the death of adults and children by measuring brain function. Id. In either a D&E or D&X procedure, any heartbeat or brain function will cease as the procedure progresses. Prelim. Inj. Tr. 113-14, 118-19. The parties to this case seem to agree that a living fetus is one whose heart is beating.

[9]In some cases the fetus is not alive at this stage. In those cases LB 23 would not apply because the abortion procedure would not involve the delivery of a "living" fetus as required by the statute.

[10]As we understand the record and the legal arguments in this case, no question is raised with respect to procedures performed on viable fetuses. The applicable legal standard is therefore the undue-burden rule of Casey.

state can also enact abortion regulations at the pre-viability stage, so long as there is no "undue burden" placed on the woman seeking to have an abortion. Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833, 876 (1992). A regulation which "has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus" creates an undue burden and is invalid. Id. at 877.

Several states have enacted statutes seeking to ban "partial-birth abortion." The precise wording of the statutes, and how far the statutes go in their attempts to regulate pre-viability abortions, differ from state to state. The results from constitutional challenges to the statutes, however, have been almost unvarying. In most of the cases that reached the federal courts, the courts have held the statutes unconstitutional.

The Sixth Circuit, the first United States Court of Appeals to consider the issue,[11] struck down an Ohio statute which attempted to ban the D&X procedure. Women's Medical Professional Corporation v. Voinovich, 130 F.3d 187, 190 (6th Cir. 1997).

---

[11]The Fourth and Seventh Circuits have also heard appeals on this issue. In the Fourth Circuit, Judge Luttig, sitting as a single judge, granted the State of Virginia's stay application after a District Court granted a preliminary injunction enjoining enforcement of the state's partial-birth abortion ban. Richmond Medical Center for Women v. Gilmore, 144 F.3d 326, 327 (4th Cir. 1998) (Luttig, J., in chambers). On July 16, 1999, however, after trial on the merits, the District Court struck down the Virginia statute. Richmond Medical Center for Women v. Gilmore, No. 3:98CV309 (E.D. Va. Jul. 16, 1999).

The Seventh Circuit reversed a lower court's decision denying Planned Parenthood of Wisconsin's motion for a preliminary injunction against enforcement of a Wisconsin statute banning partial-birth abortion. Planned Parenthood of Wisconsin v. Doyle, 162 F.3d 463, 471 (7th Cir. 1998). After a trial on the merits, the District Court upheld the constitutionality of the statute. Planned Parenthood of Wisconsin v. Doyle, 44 F. Supp. 2d 975 (W.D. Wis. 1999).

The statute specifically banned only the D&X procedure: "No person shall knowingly perform or attempt to perform a dilation and extraction procedure upon a pregnant woman." Ohio Rev. Code Ann. § 2919.15(B) (1996). The statute defined dilation and extraction as "the termination of a human pregnancy by purposely inserting a suction device into the skull of a fetus to remove the brain." Id. § 2919.15(A). The Court held, however, that the statutory definition of the prohibited abortion method included both the D&E and D&X procedures. The D&E procedure sometimes requires a physician to "compress the head by using suction to remove the intracranial contents." Voinovich, 130 F.3d at 198. The Court held that because the D&E procedure is the most common method of second-trimester abortions, the statute created an undue burden on women seeking second-trimester abortions. Id. at 201. The legislature was aiming at the D&X procedure, but the language of the statute included a definition which encompassed the D&E procedure as well.

A number of district courts have also addressed the constitutionality of state statutes banning "partial-birth abortion." Only one has upheld such a statute. See Planned Parenthood of Wisconsin v. Doyle, 44 F. Supp. 2d 975 (W.D. Wis. 1999). The other district courts faced with the issue have all held the statutes unconstitutional. See Causeway Medical Suite v. Foster, 43 F. Supp. 2d 604 (E.D. La. 1999) (partial-birth abortion act created substantial obstacle in path of women seeking safe abortion and broad language creating confusion and ambiguity rendered Act unconstitutionally vague); Planned Parenthood of Central New Jersey v. Verniero, 41 F. Supp. 2d 478 (D. N.J. 1998) (partial-birth abortion act void for vagueness because persons of ordinary intelligence must guess at meaning of phrases such as "partially vaginally delivers" and "substantial portion"); Eubanks v. Stengel, 28 F. Supp. 2d 1024 (W.D. Ky. 1998) (partial-birth abortion act created undue burden because overbroad language banned procedures necessary to guarantee right to choose to have abortion); Hope Clinic v. Ryan, 995 F. Supp. 847 (N.D. Ill. 1998) (partial-birth abortion act void for vagueness because it failed to define conduct proscribed and created undue burden because it had potential effect of banning most common and safest abortion

-13-

procedures); <u>Evans v. Kelley</u>, 977 F. Supp. 1283 (E.D. Mich. 1997) (partial-birth abortion statute vague because ambiguous and susceptible to various interpretations and overbroad because it would operate as substantial obstacle to woman's right to choose to have abortion).

IV.

The District Court in Nebraska joined the majority of the courts that have considered the issue, holding that the statute enacted by the Nebraska Legislature attempting to ban "partial-birth abortion" could not withstand constitutional scrutiny. We review the District Court's conclusions of law de novo. See <u>Planned Parenthood of Greater Iowa v. Atchison</u>, 126 F.3d 1042, 1048 (8th Cir. 1997).

In considering a challenge to the facial validity of an abortion regulation, we follow the standard set out in <u>Casey</u>. See <u>Planned Parenthood, Sioux Falls Clinic v. Miller</u>, 63 F.3d 1452, 1458 (8th Cir. 1995). If the regulation operates "as a substantial obstacle to a woman's choice to undergo an abortion 'in a large fraction of the cases in which [it] is relevant, . . . [i]t is an undue burden, and therefore invalid.' " <u>Id</u>. (quoting <u>Casey</u>, 505 U.S. at 895).

The District Court determined that LB 23 created an undue burden because in many instances it would ban the most common procedure for second-trimester abortions, the D&E. The State argues that LB 23's ban on partial-birth abortion prohibits only the D&X procedure, and not the D&E. Under the statute, a person is prohibited from "deliberately and intentionally delivering into the vagina a living unborn child, or a substantial portion thereof, for the purpose of performing a procedure that the person performing such procedure knows will kill the unborn child and does kill the unborn child." Neb. Rev. Stat. § 28-326(9) (1998). The State argues that the Nebraska Legislature's intent was to ban only the D&X procedure. The language of the statute, however, describes a procedure which encompasses more than just D&X.

-14-

In interpreting the statute, it is our duty to give it a construction, if reasonably possible, that would avoid constitutional doubts. We cannot, however, twist the words of the law and give them a meaning they cannot reasonably bear. The crucial problem is the term "substantial portion," which is nowhere defined in the statute. What the term means for the purposes of LB 23 has been debated at length, both in the record before us and on the floor of the Nebraska Legislature. But if "substantial portion" means an arm or a leg – and surely it must – then the ban created by LB 23 encompasses both the D&E and the D&X procedures. We agree with the District Court's assessment that "[i]n any sensible and ordinary reading of the word, a leg or arm is 'substantial.' " Carhart v. Stenberg, 11 F. Supp. 2d 1099, 1129 (D. Neb. 1998). In the D&E procedure, the physician often inserts forceps into the uterus, grasps a part of the living fetus, and pulls that part of the fetus through the cervix. That part of the fetus is commonly an arm or a leg. Prelim. Inj. Tr. 117-18; Trial Tr. 31. LB 23 bars intentionally bringing a substantial portion of a living fetus into the vagina for purposes of performing a procedure that will kill the fetus. A physician who brings an arm or a leg into the vagina as part of the D&E procedure therefore violates the statute.

The State argues that the statute's scienter requirement limits the statute's scope. The partial vaginal delivery of a substantial portion of the living fetus must be done "deliberately and intentionally." The statute applies, according to the State, only to the deliberate and intentional performance of a "partial-birth abortion." The State defines the proscribed procedure as involving the intentional "1) partial delivery of a living fetus vaginally, 2) killing the fetus and 3) completing the delivery." Appellant's Br. 66-67. But the D&E procedure involves all three of those steps. The physician intentionally brings a substantial part of the fetus into the vagina, dismembers the fetus, leading to fetal demise, and completes the delivery. A physician need not set out with the intent to perform a D&X procedure in order to violate the statute. It is enough that the physician have the intent to deliver vaginally a substantial portion of a living fetus, and that occurs in the D&E procedure.

-15-

Additionally, the person performing the procedure must do so with the purpose of performing a procedure that the person knows "will kill the unborn child and does kill the unborn child." Neb. Rev. Stat. § 28-326(9) (1998). In any abortion procedure the physician performing the procedure does so knowing, and with the purpose, that the procedure will kill the fetus. The language of LB 23 describes a method of abortion that includes the D&E procedure, and the intent requirement of the statute does not work to protect physicians who perform the D&E procedure from violating the statute. LB 23 not only prohibits the D&X procedure, but the D&E procedure as well.

V.

Having determined that LB 23 bans the D&E procedure, we turn now to the question of whether such a ban imposes an undue burden on women seeking second-trimester abortions.

In <u>Planned Parenthood of Central Missouri v. Danforth</u>, 428 U.S. 52, 79 (1976), the Supreme Court held unconstitutional a statute proscribing the use of saline amniocentesis as a method of abortion. Saline amniocentesis was then the most commonly used procedure for abortions performed after the first trimester. <u>Id</u>. at 78. By prohibiting the use of the procedure, the statute would effectively inhibit the vast majority of abortions performed after the first trimester. <u>Id</u>. at 79. <u>Danforth</u> was decided under the trimester framework of <u>Roe</u>. Although <u>Casey</u> changed that framework, the ban in <u>Danforth</u> meets the undue-burden standard of <u>Casey</u>. See <u>Voinovich</u>, 130 F.3d at 201: "An abortion regulation that inhibits the vast majority of second trimester abortions would clearly have the effect of placing a substantial obstacle in the path of a woman seeking a pre-viability abortion." LB 23 does not limit all second-trimester abortions. It does, however, prohibit the most common procedure for second-trimester abortions and, in doing so, imposes an undue burden on a woman's right to choose to have an abortion.

## VI.

In its final argument, the State suggests that <u>Roe</u> and <u>Casey</u> do not apply to LB 23 because <u>Roe</u> and <u>Casey</u> apply only to the "unborn" and do not prohibit states from protecting partially born human beings. The State argues that "the Supreme Court has left protection in place for the partially born." Appellant's Br. 71. The State also suggests that because the partial-birth abortion procedure involves a fetus which is more outside of the uterus than inside, the fetus is not unborn, sufficiently distinguishing this case from <u>Roe</u> and <u>Casey</u>. The phrase "partially born" is new to us. Apparently the State uses it to describe a process in which the fetus is killed when it is more outside the womb than inside. If we assume that there is such a legal category, and that, as the State argues, the rule of <u>Roe v. Wade</u> does not apply to it, the argument is still unavailing on the record before us in this case. As we have explained, the Nebraska statute is violated when an arm or a leg of a fetus that is still alive is pulled out of the womb as part of the D&E abortion procedure. In such a situation, although a substantial part of the fetus, as defined by the Nebraska law, has been extracted from the uterus, it cannot be said that the fetus as a whole is more outside the uterus than inside. In addition, we think that the word "born" refers most naturally to a viable fetus, one that is capable of surviving outside the mother. The Nebraska statute is not limited to viable fetuses. Indeed, as we have observed, both the proof and the legal arguments in this case seem to be exclusively about nonviable fetuses. So if there is a separate legal category for the "partially born," and we express no view on that question, we do not see how it could be relevant to the present case.

## VII.

Mike Munch, in his official capacity as County Attorney for Sarpy County, appeals the District Court's award of attorney's fees against him. After the District Court held LB 23 unconstitutional, Dr. Carhart sought, and was awarded, attorney's fees, pursuant to 42 U.S.C. § 1988. Section 1988 allows a plaintiff who has brought

a successful suit under 42 U.S.C. § 1983 to recover, at the court's discretion, reasonable attorney's fees from the defendant. The statute provides that "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988(b) (1994). Because Dr. Carhart was a prevailing party, the District Court appropriately granted his request for attorney's fees.

Mr. Munch is the County Attorney in Sarpy County, the county in which Dr. Carhart practices medicine. Dr. Carhart named Mr. Munch in the lawsuit in his official capacity as Sarpy County Attorney and as a representative of all county attorneys in Nebraska. Mr. Munch agrees that Dr. Carhart was a prevailing party. He argues, however, that the award of attorney's fees should not apply against him. We review the award of attorney's fees for an abuse of discretion. See Hatfield v. Hayes, 877 F.2d 717, 719 (8th Cir. 1989).

A prevailing party in a § 1983 suit "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." Id. According to Mr. Munch, the special circumstances in this case are that as a government official he is bound to follow state law and enforce LB 23, and that he did not actively participate in the lawsuit. The short answer is that governmental officials are not bound to follow state law when that law is itself unconstitutional. Quite the contrary: in such a case, they are bound not to follow state law. It is true that a prosecuting attorney may not know for certain whether a state law is valid or not, and that he may feel obliged to enforce the law until a determination as to its validity has been made. This, however, is not a special circumstance justifying the denial of the customary award of fees. Presumably it will always be true that state officials enforcing a law or otherwise defending state action will believe, or at least hope, that the law or action in question will be upheld against a federal constitutional attack. The point of § 1988 is that such officials proceed at their peril. If in fact they are wrong, and the law they are enforcing turns out to be invalid, § 1988 puts the financial burden on the state officials. The

-18-

judgment of Congress is that the burden rests more properly on them than on the party who has been wronged by the application of an invalid law.

In addition, although Mr. Munch has not had the opportunity to enforce LB 23, he has made it clear that he would prosecute under the statute. J.A. 646-47. Awarding fees against officials bound to enforce the law is a "run-of-the-mill occurrence[]." Supreme Court of Virginia v. Consumers Union of the United States, 446 U.S. 719, 739 (1980). Additionally, Mr. Munch has the discretion to choose when to prosecute. We find no merit in this argument.

Mr. Munch's argument that he did not actively participate in the lawsuit and that he should not, therefore, be responsible for the attorney's fees, is equally without merit. His role in the proceedings may have been minor, but this does not excuse him from having to share in the actual costs. He relied on his co-defendants to present their defense of the constitutionality of LB 23, a statute he has indicated he would enforce, and he cannot now avoid helping to pay the prevailing party's attorney's fees.

The District Court did not abuse its discretion in holding Mr. Munch liable, jointly and severally with the other defendants, for the attorney's fee award. How the defendants choose to allocate the fees among themselves is entirely up to them.

## VIII.

For the foregoing reasons, we affirm the judgment of the District Court.

-19-

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.